Vernon **COLLINS** et al.

v.

**Hiram L. SCHOONFIELD, Warden, et al.**

**Civ. No. 71–500–K.**

United States District Court,
D. Maryland.

May 15, 1972.

Stephen H. Sachs, Joseph A. Matera, Michael A. Millemann, Michael Elder, Luther C. West, Baltimore, Md., and Stanley Bass, New York City, for plaintiffs.

George L. Russell, Jr., City Sol., Ambrose T. Hartman, Deputy City Sol., William Hughes, Carol S. Sugar and Neil J. Lewis, Asst. City Sol., Baltimore, Md., for defendants.

1. One of the original eight plaintiffs dropped out of the case.

2. One of the persons named as a defendant is no longer a member of that Board, having become since the inception of this suit, the Hearing Officer for the Jail. Two new Board members have been named as defendants pursuant to Federal Civil Rule 25(d).

3. Damages for confinement in isolation cells are sought by plaintiffs Collins, Dutton, Costes and Whitfield for such confinement in February and March of 1971, by plaintiffs Collins, Dutton, Dailey and Whitfield for such confinement in November, 1971, by plaintiff Powell for such confinement in September and October, 1971, and by plaintiff Morris for such confinement "during early 1971."

FRANK A. KAUFMAN, District Judge.

■ On May 7, 1971, this suit was instituted by eight pre-trial detainees then in the Baltimore City Jail. Prior to the commencement of trial on January 10, 1972, an amended complaint was filed by seven of the original named plaintiffs [1] plus one additional plaintiff, also a pre-trial detainee. By the time of trial, several of the original and continuing plaintiffs had been tried and either released from, or continued in post-trial, confinement in the Jail. Defendants are the Jail's Warden and two Deputy Wardens, and the President, Secretary, two members and an ex-officio member of the Baltimore City Jail Board.[2] Equitable and declaratory relief is sought by all plaintiffs against all defendants. Monetary damages are claimed by seven of the eight current plaintiffs against the Warden and the two Deputy Wardens.[3] Jurisdiction exists under 28 U.S. C. § 1343, the jurisdictional counterpart of 42 U.S.C. § 1983.[4]

Eleven equitable issues are presented herein, as follows:

1. The constitutionality of solitary confinement including the constitutionality of:

a. Isolation cells which are barren of any internal furnishings;

b. Isolation cells which have only a combination sink/toilet as a furnishing;

Each plaintiff seeks "compensatory and punitive monetary damages * * * in the amount of Ten Thousand Dollars * * *" (Amended Complaint, p. 22).

4. 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Baltimore City officials, acting in their official capacities, act under color of *state* law within the meaning of that statute.

2. The constitutionality of maximum security confinement, confinement in a cell without release for recreation, outside exercise, showers, commissary privileges, visits, etc.;

3. The constitutionality of summary ex parte punishment or denial of privileges without observing minimal rudiments of procedural due process;

4. The constitutionality of policies which require or authorize the censoring, reading and/or photocopying of mail between inmates and their attorneys, judges and judicial officers, legislators and public officials, friends, family members and newsmen or representatives of the media;

5. Whether or not there is a denial or significant delay in medical services and health care delivery to inmates denying them constitutional rights;

6. Whether or not the food and diet afforded plaintiffs and the method of delivering that diet denies them basic constitutional rights;

7. Whether or not policies which restrict both legal and non-legal visits deny plaintiffs constitutional rights;

8. Whether or not the aggregate conditions and policies at the jail so substantially impede trial preparation as to deny plaintiffs constitutional rights;

9. Whether or not policies and practices at the jail regarding the access of inmates to literature and their ability to receive literature, including books, newspapers, magazines, etc., denies plaintiffs constitutional rights;

10. Whether or not the practices and policies of the Baltimore City Jail governing the frequency with which inmates may attend religious services or receive visits from clergymen denies plaintiffs constitutional rights;

11. Whether or not the confinement of plaintiffs under the aggregate conditions and policies in this case denies them equal protection of the laws.[5]

The parties agreed that the equitable issues should be tried separately from the damage claims and that the former should be tried first. The plaintiffs have not asked for a jury trial of the damage or any other claims. However, the Warden and the two Deputy Wardens, from whom monetary damages are sought, have reserved their respective individual rights to a jury trial of the damage claims. In advance of trial of the equitable issues counsel for both sides agreed that the first equitable issue, i. e., the constitutionality of solitary confinement in the Jail, and the damage claims growing out of specific alleged instances of such confinement, might pose for determination common questions of disputed fact and that under the principles set forth in Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and its progeny,[6] the Warden and the two Deputy Wardens have the right not to have any disputed fact found in a non-jury trial of the first equitable issue which would be relevant and material in the later trial of the damage claims.[7] Additionally, during trial, it

5. Pre-Trial Memorandum, dated December 12, 1971, pp. 1–2.

6. *See* Johns Hopkins University v. Hutton, 326 F.Supp. 250 (D.Md.1971) and 343 F. Supp. 245 (in section I thereof) (D.Md., 1972).

7. Pre-Trial Memorandum, pp. 2–3, provided:

Issues reserved for adjudication before a jury at a trial to be held at dates subsequent to the aforementioned

January 10, 1972 trial as requested by defendants, will be:

1. Whether or not plaintiffs have been confined in solitary confinement or isolation cells because they have exercised their constitutional rights or because they have engaged in other otherwise constitutionally protected behavior.

2. The precise conditions of cleanliness, duration of punishment, and other conditions suffered by plaintiffs while confined in isolation cells.

became apparent to Court and counsel that the non-jury trial of equitable issues 2–10, inclusive, might also require the finding of facts which might not be entirely unconnected with disputed factual areas presented by the solitary confinement issue and/or the monetary damage claims. For that reason, counsel and each of the parties have agreed that no facts found by this Court in this opinion will be used as evidence in the trial still to be held, nor will the transcript of the trial, which has been held, "be used, in any manner, by *any* party to this litigation" during the trial still to be held though none of the parties are prohibited from seeking to introduce in that future trial "any evidence" used in the trial which has been held.[8]

█ Plaintiffs, in connection with their claims for equitable and declaratory but not for monitary relief, sought, and have been permitted by this Court, to bring this case as a class action un-

der Federal Civil Rule 23(b) (2).[9] Defendants, however, challenged the jurisdiction of this Court and moved to dismiss this case under Federal Civil Rule 12(b) upon that ground and also for failure of the complaint, as originally filed and as amended, to allege any violation of the Federal Constitution or of any federal statute and thus to state any cause of action, for equitable, declaratory or monetary relief, under 42 U.S.C. § 1983. Treating that motion as a motion for summary judgment under Federal Civil Rule 56 because of the existence of pre-trial factual stipulations and the presentation of documents outside of the pleadings (*see* Federal Civil Rule 12(b)), this Court, prior to trial, denied the defendants' motion without prejudice to the right of the defendants to reassert subsequently, during or after trial, any of the contentions set forth in the motion. Also, prior to trial, the defendants filed an answer denying any

---

3. Whether or not defendants have punished plaintiffs or otherwise discriminated against them, in other substantial ways beyond confinement in isolation cells, because they have exercised constitutionally protected rights or because they have engaged in innocuous or protected behavior.

4. Whether the defendants have beaten, tear-gassed, and maced plaintiffs without necessary legal justification.

8. See documents signed by or on behalf of all named plaintiffs and defendants after the conclusion of this trial and filed in this case (emphasis in original).

9. Defendants, while stating they did not believe a class action was needed for equitable and declaratory relief, *see* Bundy v. Cannon, 328 F.Supp. 165, 168 (D. Md.1971), stated, prior to trial, their lack of opposition to the designation by this Court of a class composed of all inmates of the Jail during the pendency of this case, in view of the fact that certain of the named plaintiffs could be expected not to be inmates of the Jail upon final determination of the equitable issues in this case. That expectation became fact when, during trial, two of the plaintiffs were transferred from the Jail to the Maryland Penitentiary. In view of the possibility that some or all of the issues presented herein would become moot if

and when *all* of the named plaintiffs were no longer inmates of the Jail, *see* SEC v. Medical Committee for Human Rights, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L. Ed. 475 (1952); Troy State University v. Dickey, 402 F.2d 515 (5th Cir. 1968), this Court agreed that plaintiffs were entitled to proceed in a class action. For cases in which class actions by state prisoners have been permitted,

*See* Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Calif. 1971); Hamilton v. Love, 328 F.Supp. 1182, 1190–1191 (E.D.Ark.1971). While recognizing that notice may not be required in class actions under Federal Civil Rule 23(b) (2), *see* Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969); Northern Natural Gas v. Grounds, 292 F.Supp. 619, 636 (D. Kan.1968); 3B J. Moore, Federal Practice ¶ 23.55 at 1151–54 (2d ed. 1969), counsel for both sides agreed that some notice should be given in this case as a matter of due process, but that the notice should be confined to the listing of the equitable issues, be signed by counsel for plaintiffs, not be a notice from this Court, and be posted in one or more agreed places within the Jail. Such notice was in fact given.

conduct by them in violation of any federal constitutional or statutory provision.

■ Plaintiffs' allegations claim, *inter alia*, violations by defendants of the proscription of the Eighth Amendment against cruel and unusual punishment, of the guarantees of the First and Sixth Amendments, and of the due process clause of the Fourteenth Amendment.[10] While federal courts have historically been loathe to interfere in the operation of state and local prisons, they have long since recognized that a person entering a non-federal confinement institution does not leave all of his constitutional rights behind him,[11] even though those rights are obviously subject to great curtailment in post-conviction confinement and to a lesser extent in pre-trial confinement. And in an increasing number of suits, the federal courts have entertained complaints of prisoners in non-federal institutions under 42 U.S.C. § 1983, without requiring exhaustion of state court remedies and without abstaining in order to permit a state court proceeding to be filed and prosecuted.[12] Nevertheless, a federal court may only invalidate such practices of a state institution if those practices constitute violations of federally guaranteed rights. Accordingly, this Court, no matter how completely it may be convinced by the testimony of expert witnesses concerning the lack of wisdom and the inadequacy of certain practices at the Jail, or the superiority of alternative methods, may only require the cessation of such practices as are violative of federal constitutional precepts. In this case, the evidence establishes the merit of some of plaintiffs' allegations of denial of constitutional rights. Defendants have defended, at least in part, by noting their oft-expressed requests for additional money to employ and provide more and better trained personnel, physical facilities, programs, and the like. But constitutional deficiencies are not obliterated by such apologia.[13]

■ There are certain minimum standards below which today's society cannot sink in its treatment of those of its members who must, for one reason or another, be confined in jails and prisons. Those minimums must be read within the constitutional setting of 1972, not that of 1789. Conditions of confinement which may have been acceptable in that earlier year do not necessar-

10. The Eighth Amendment has been made applicable to the states. *See* Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). So have the First Amendment, *see* Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and the Sixth Amendment, *see* Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

11. *See, e. g.*, Jackson v. Bishop, 404 F.2d 571, 576 (8th Cir. 1968); Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir. 1966); McCloskey v. State, 337 F.2d 72 (4th Cir. 1964).

12. The Supreme Court has made it clear that a federal district court may not require exhaustion of available state judicial remedies in connection with claims for relief under the Civil Rights Act, 42 U.S.C. § 1983, by prisoners in state institutions. Humphrey v. Cady, 404 U.S. ——, 92 S.Ct. 1048, 31 L.Ed.2d 394, 407 n. 18 (1972); Wilwarding v. Swen-

son, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed. 2d 418 (1971); Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Sostre v. McGinnis, 442 F.2d 178, 182 (2d Cir. 1971). Whether a federal court may require exhaustion of internal prison hearing procedures available to a state prisoner is a question the Fourth Circuit recently left unanswered as posing an issue which did not need to be faced in Hayes v. Secretary of Department of Public Safety, 455 F.2d 798 (4th Cir. 1972).

13. "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by *dollar considerations* * * *." Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968) (Blackmun, J.) (emphasis supplied). *See* Watson v. Memphis, 373 U.S. 526, 537, 83 S. Ct. 1314, 10 L.Ed.2d 529 (1963); Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D.Ark.1971); Holt v. Sarver, 309 F. Supp. 362, 385 (E.D.Ark.1970).

ily pass current constitutional muster.[14] But it is only that failure which constitutes violation of today's minimum requirements which a federal court can proscribe in a case such as this. Over a federally operated confinement institution, a federal court may perhaps have supervisory power, as may a state court in Maryland or in any other state, over the operation of its own state institutions.[15] But this Court has no supervisory power as such over the Baltimore City Jail.[16] Thus, each of plaintiffs' complaints herein must be weighed and considered in terms of whether they violate the minimal standards established by the guarantees and the proscriptions of our Federal Constitution, not in terms of what this Court might or might not think is the best or the better practice.

It is also necessary at the outset of this opinion to differentiate between pre-trial detainees and those confined after conviction.[17] The latter are subject to such measures as are justifiable in order to achieve the purposes of confining persons found guilty beyond a reasonable doubt of commission of crime. Those purposes encompass the punishment of, the exaction of retribution in connection with the conduct of, the deterrence from future crimes by, and most importantly the hoped for rehabilitation of the individual prisoner, as well as de-

terrence of others.[18] But the pre-trial detainee in the Baltimore City Jail, or any other confinement institution, is there only, unless he is charged with a capital offense, because he cannot make bail.[19] Therefore, in confinement he can only be deprived of the constitutional rights a defendant on bail awaiting trial enjoys to the extent such denial is required to insure that he appears at trial and to restrain him from endangering or disrupting the security of the institution in which he is detained, or to deter him, if his conduct has already caused such danger or disruption, from repeating such conduct. A pre-trial detainee is innocent of the crime of which he is charged and in connection with which he is confined until proven guilty beyond a reasonable doubt. The evidence in this case discloses that over 80% of the inmates in the Jail are pre-trial detainees and that some of them had never before their confinement in the Jail been held in confinement, though a number of them had been so confined or been previously convicted of prior crimes including violent offenses. In addition, the evidence in this case establishes that a number of the pre-trial detainees in the Jail are either found not guilty at trial, or sometimes have their cases dismissed before trial, or are released on probation after pleading guilty or after conviction at trial. But the evidence in

---

14. "The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed. 2d 630 (1958).

15. *See, e. g.,* McCray v. Maryland, Misc. Pet. 4420 (Circuit Court for Montgomery County, Maryland, November 11, 1971) ; Wayne County Inmates v. Wayne County Board of Commissioners, Civil No. 173–217 (Circuit Court for the County of Wayne, Michigan 1971).

16. There is no federally operated confinement institution or detention center in Maryland. Therefore, by contract with the City of Baltimore, the Federal Bureau of Prisons houses in the Baltimore City Jail certain pre-trial detainees and certain post-trial convicted persons await-

ing sentencing or transfer to federal prisons. Similar arrangements, involving the housing of lesser numbers of persons, exist with several of Maryland's counties. But none of those agreements in any way confer upon this Court any general supervisory power over any such institution.

17. *See, e. g.,* Anderson v. Nosser, 438 F.2d 183, 191 (5th Cir. 1971) ; Conklin v. Hancock, 334 F.Supp. 1119, 1121 (D. N.H.1971) ; Hamilton v. Love, 328 F. Supp. 1182, 1193 (E.D.Ark.1971) ; Jones v. Wittenberg, 323 F.Supp. 93, 100 (N.D. Ohio 1971) ; Tyler v. Ciccone, 299 F. Supp. 684 (W.D.Mo.1969).

18. *See* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971).

19. U.S.Const. amend. VI.

this case also supports the warning that the law may not and should not "presume" that all pre-trial detainees are "choir boys, or campfire girls" or do not "present serious problems and threats to the jail community."[20] Nevertheless, even so, they are in a different category than are post-conviction inmates.

Counsel for both sides have stressed the recurrence in the case of certain evidentiary and attitudinal themes, including, on plaintiffs' part, the relative lack of any testimony of the named individual defendants, the making by the Jail authorities of certain "eleventh hour" changes which are said by defendants to render moot certain of plaintiffs' prayers for equitable relief, the alleged efforts of defendants to hide information about the Jail from the public, and the confrontation between Jail inmates and Jail officials produced by punitive policies of the latter. In response, defendants point to other themes, including, the focus by plaintiffs upon inmates' rights in an absolute sense and the absence on plaintiffs' part of any understanding of the inmates' "concomitant obligation to act responsibly."[21]

In the seven months which elapsed between the filing of this suit and the commencement of trial, counsel engaged profitably and in depth in formal and informal discovery, in legal research, and in formulations of legal issues. They cooperated at all times with this Court and worked sensibly with one another without retreating from their own positions. However, on a number of occasions during that period, counsel for plaintiffs complained that plaintiffs, and other inmates of the Jail cooperating with them, were discriminated against by Jail officials because of the pendency of this case; and counsel for defendants stated that at least some of the plaintiffs were intentionally attempting to provoke reprisals by Jail officials so that plaintiffs could point to such reprisals, during trial, as instances of unconstitutional conduct. With the agreement of all counsel, this Court on January 5, 1972 addressed a letter to counsel which provided, *inter alia:*

Counsel for defendants are hereby instructed and required to inform, as promptly as possible, the named defendants, and each of them, that no inmate of the Baltimore City Jail is to be discriminated against, or be the subject of any retaliatory or disciplinary action, because of his participation in any capacity in this case. However, in addition, counsel for plaintiffs are hereby instructed and required to speak with all of the named plaintiffs in this case as promptly as possible and to inform them that this Court will expect them, and all other members of the class they represent, not to utilize the pendency or trial of this case in any way so as to create problems of administration and discipline within any institution in which they are confined.

The evidence in this case and the conduct of some of the parties in the courtroom during more than twenty days of trial convinced this Court that there have been violations by both sides of the spirit, if not the letter, of this Court's January 5th communication.[22] Several of such instances, including the require-

---

20. Wayne County Inmates v. Wayne County Board of Commissioners, Civil No. 173–217 (Circuit Court for the County of Wayne, Michigan 1971), at slip sheet p. 71.

21. Defendants' Post Trial Brief, p. 5.

22. Repeatedly, during trial, plaintiffs asked this Court to cite the Warden for such alleged violations. Just as repeatedly, this Court refused so to do, exercising its discretion to have counsel persuade their respective clients to achieve the maximum compliance with this Court's January 5, 1972 directive and awaiting the presentation of all evidence before reaching any definitive conclusions. Defendants also complained on a number of occasions during trial of the effect of the trial on the operation of the Jail and of the conduct of plaintiffs. While this Court, as aforesaid, is convinced that both sides failed to abide by the spirit of its January 5, 1972 directive, nevertheless, such vio-

ment by the Warden, after the trial started, of the stricter observance of lock-up conditions in the section of the Jail housing those of the named plaintiffs then confined in the Jail, the discovery in that section of a fifteen gallon container of an inmate-made brew called "jump steady", and the solitary confinement of and failure to afford medical treatment to an inmate who is not a named plaintiff, caused interruptions of the plaintiffs' presentation of evidence. Upon two such occasions, the Warden took the stand. However, during the defendants' side of the case, no named defendant took the witness stand. The failure of the Warden and of certain of the Jail officers to contradict not only the testimony of inmates, but also of other prison officers, one of the Jail chaplains, members of the bar of Baltimore City, and other observers of and participants in the Jail's operations during the recent past, is a factor which has been given weight[23] in this opinion. This is not a case in which such testimony would merely have been cumulative of other evidence which was adduced. This is a case in which defendants, and the Warden in particular, and the Deputy Wardens to a lesser extent, did not respond to specific allegations concerning statements and attitudes attributed to them and Jail personnel under their direct supervision.

Defendants in their Post Trial Brief have written (at pp. 1–2):

> The City Jail is located in the heart of Baltimore City. A city that has its share of ghettoes, poverty, crime and human misery * * *. The social decay of the city spills over and helps to fill up the population of the jail. In the area of violent crimes, Baltimore City sadly but irrefutably is a leader in the nation. * * *

The alleged criminals at the jail are in all candor a microcosm of "society's cancer". * * *

There are perhaps few who can understand, much less master, the swirling and conflicting currents which surround and engulf our American society in this last third of the Twentieth Century. No wonder that those charged with the administration of the Baltimore City Jail, and those confined therein, find themselves almost inevitably propelled into the undertow created by an institution built to house several hundred short-term inmates and today bursting at its seams with about 1400 pre-trial and post-trial detainees—more than a few of whom inhabit its confines for more than a year. Society's present problems are reflected in unreal dimensions within the institution, just as the mirrors of the amusement park of yesterday distorted the physical attributes of the persons standing in front of them. But, unlike those mirrors, the institution does not stop at mere distortion, but exposes in their stark nakedness the effects of our failure to come close to solving so many of those problems.

Those in command within the Jail are saddled with an old structure, remodelled to some extent in the not-too-distant past, yet lacking in room and facilities for recreation, education, training and relaxation. And those in command must operate within limited physical facilities in the face of perhaps even greater inadequacies of funds and trained personnel.

The inmates of the Baltimore City Jail include some who prey on others within our society, some who have turned to crime at least in part because of addiction to or use of drugs or alcohol, and some who are in protest, either as members of the black minority, or otherwise,

---

23. lations did not prevent the effective presentation of evidence in this case, though such violations did contribute to the continuation of the confrontation between prison inmates and prison officials discussed *infra*.

23. *See* United States v. Priola, 272 F.2d 589, 594 n. 10 (5th Cir. 1959); 2 Wigmore on Evidence § 289 (3d ed. 1940); *see also* United States v. Cotter, 60 F.2d 689, 692 (2d Cir. 1932) (L. Hand, J.).

against the so-called establishment and the majority patterns of our society. As the trial judge in this case, I witnessed from the bench, displayed on the faces of witnesses and parties, the most deeply felt antagonisms and resentments. Nearly each time I made a ruling, even of a minor evidentiary nature, daggers of criticism, displeasure and deep emotion burst forth from the faces of the side against whom I ruled. And that was true of those in authority as well as those confined.

Against that background, while it is not hard to recognize the factual and legal issues and sub-issues in this case, it is more difficult to provide or even to suggest solutions in connection with them, and it is most difficult for those charged with the task to establish an ongoing system which meets the minimums of federal constitutional principles and hopefully of higher standards.

The Warden and the guards at the Baltimore City Jail are subjected to almost unbelievable verbal abuse—certain of them have been physically assaulted and injured—they live in, and they often act out of, sheer fear for their safety and even their lives. On the other hand, many of the inmates, no matter what they may have done before, or do while in the Baltimore City Jail, live in conditions of physical, moral and emotional degradation and terror. The tensions between those in command and those subject to command have long since passed the boiling point. While those tensions may have been exacerbated in and by this suit, nevertheless, the very pendency of this suit—and the drama of the courtroom—has provided, at least to some extent, an opportunity for some steam to escape from what has largely been a sealed cauldron.

In their Pre-Trial Memorandum, the parties stipulated to certain facts and agreed upon certain legal principles, with regard to the eleven equitable issues presented in this case. In this opinion, references will appear to a number of those agreements among counsel. In each instance, this Court approves the factual stipulations and is in substantial agreement with and adopts, subject only to the views expressed specifically in this opinion, counsel's agreed statements of law. After trial, proposed findings of facts and conclusions of law were submitted. Most of the remainder of this opinion will devote itself to those specific eleven issues.

### Solitary Confinement
#### Strip Cells

The parties have stipulated: [24]

There are two brick or cement cells without any fixtures or any furnishings in the Baltimore City Jail. There is a small hole in the floor covered by a metal grate which is used for the elimination of bodily wastes. Drinking water must be provided from the outside by guards.

Under the heading, "Undisputed Law," the parties have agreed:

Except under extreme conditions, the uninterrupted confinement, for a substantial period of time, of pre-trial inmates in "strip cells" without mattresses, clothes, a toilet, regular medical visits, running water, access to counsel is unconstitutional * * [25]

As stated supra,[26] disputed factual questions pertaining to isolation cells are reserved for later trial.

24. Pre-Trial Memorandum, p. 4.

25. Pre-Trial Memorandum, p. 3. At pp. 3–4 thereof, the parties have cited or referred to on a See basis, Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Jones v. Wittenburg, 323 F.Supp. 93 (D.Ohio 1971); Knuckles v. Prasse, 302 F.Supp. 1036, 1061–1062 (E.D.Pa.1969), aff'd, 435 F.2d 1255 (2d Cir. 1970); Hancock v. Avery, 301 F. Supp. 786 (N.D.Tenn.1969); Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969), aff'd, 442 F.2d 304 (8th Cir. 1971); Barnes v. Hocker, No. 2071 (D.Nev. September 5, 1969); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966); McCray v. Maryland, Misc.Pet. 4363 et seq. (Circuit Court for Montgomery County, Md.1971).

26. See pp. 3–5, supra.

*Isolation Cells Other Than Strip Cells*

The parties have stipulated: [27]

Aside from the two strip cells without any furnishings or fixtures, there are a larger number of isolation cells equipped with a combination toilet-sink flushed from outside the cell.

The parties have agreed that the following is "undisputed law": [28]

Non-suicidal inmates and those inmates in solitary confinement whose immediate conduct presents no present threat to the property, life or safety of himself or others must not be denied as a means of discipline the following: toilet facilities, running water, a mattress, essentials of personal hygiene, the opportunity to bathe at regular intervals, the opportunity to exercise outside the cells at reasonable intervals, regular meals of adequate nutritional value, attorney visits, clean clothing and a periodic review of the necessity for continued solitary confinement. * * *

▮▮▮▮▮ The parties also agreed in the Pre-Trial Memorandum that pre-trial detainees may under some circumstances be confined in a solitary confinement cell. They disagree with regard to the reasons and circumstances justifying such confinement and with regard to conditions of confinement, including medical supervision and communications with family. In this Court's view, a pre-trial detainee may not be disciplined in any way except to the extent reasonably required in order to insure his presence at trial and to maintain the order and security of the institution. Thus, he should, if it is reasonably necessary to place him in any kind of isolation, be permitted to maintain contact with his family and to exercise, shower and enjoy other privileges except to the extent that he must be deprived of those opportuni-

ties so that his confinement and the order and security of the institution can be maintained. In addition, each inmate, placed in isolation, whether he is in pre-trial or post-trial confinement, must receive medical visits or attention to insure that his physical and mental well-being is not being harmed. The frequency of such visits should be determined in accordance with acceptable medical standards and security considerations. Those standards should be promulgated in detail by defendants with the advice of medical authorities, but not, unless defendants fail so to do, by this Court.

In the trial which has taken place, the Catholic chaplain of the Jail (Father Toby), testifying on a Tuesday during January, 1972 as a witness called by plaintiffs, stated that an inmate, not a named plaintiff herein, had been placed in an isolation cell for a ten-day period, commencing the previous Friday, that he (Father Toby) had visited the man on Saturday and Sunday, that the man was apparently suffering from hepatitis, and had not been seen by a doctor or given any medical attention despite the fact that he (Father Toby) had informed several Jail officers that the man seemed quite ill. Father Toby also testified that while the cell was clean, the temperature was not too cold, the man was dressed in shirt and pants, the toilet and wash bowl were in working order, and there was a mattress on the floor, the man had no soap, no towel, had not been permitted to shower, the cell was entirely bare, there was no light at all and no reading matter of any kind available.

The record in this case establishes that after the inmate in question was seen in the Jail infirmary and was noted as perhaps having hepatitis, he was, on the Friday before Father Toby testified, transported from the Jail in the back

---

27. Pre-Trial Memorandum, p. 6.

28. Pre-Trial Memorandum, pp. 4–5. The parties have cited, *inter alia*, Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Krist v. Smith, 309 F.Supp. 497 (S.D.

Ga.1970). *See also* Breeden v. Jackson, 457 F.2d 578 (4th Cir. March 21, 1972); Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971); Burns v. Swenson, 430 F.2d 771, 777 (8th Cir. 1970).

of a Jail pick-up wagon for examination at City Hospital. Somehow, en route, he freed himself sufficiently from handcuffs and other restraining devices, and when the truck arrived at the hospital and the accompanying Jail guard opened the back door of the truck, the inmate assaulted the guard. The latter, with the aid of a passerby, subdued the inmate who was then returned to the Jail without examination at City Hospital and was placed in an isolation cell, and kept there after a hearing on Saturday.

■■■ After Father Toby testified on the Tuesday which followed the man's confinement on Friday, this Court was assured by counsel for defendants that the Warden would make certain that the Jail doctor would, without delay, examine the man and that a further report would be made to this Court. On the following (Wednesday) morning, the information given to this Court with regard to the inmate was confused and contradictory. Accordingly, prior to the lunch break, this Court asked that the Warden talk to the Jail doctor and inform this Court after the lunch break as to the true facts. At the commencement of the Wednesday afternoon session, the Warden took the stand and under direct and cross-examination testified that the Jail doctor, at about 2:00 p. m. that day (Wednesday), had seen the inmate for the first time since the latter had been placed in isolation on the previous Friday and that as a result of his talking to the doctor, he (the Warden) had ordered the inmate to be moved to and retained in the Jail infirmary.[29] The Warden also testified that he had given orders Tuesday afternoon to have the Jail doctor visit the inmate and had again given those orders at 8:30 a. m. that day (Wednesday). Testimony revealed that the Jail doctor had been in the Jail on that Wednesday morning but had not seen the inmate who in fact was eventually seen early Wednesday afternoon and diagnosed as having hepatitis. The Jail doctor, testifying in this case, stated that in his opinion it is not advisable to place a person with hepatitis in solitary confinement. Even taking fully into account the type of inmate involved, this Court holds that the lack of medical treatment in this particular instance which occurred during the trial of this case cannot be permitted by any court, state or federal, unless the doctrine that the Constitution does not stop at the jail-house gate is a mockery— which, as the opinions of the state and federal courts, in increasing number, reveal, it is not.[30]

### Punishment for Constitutionally Protected Behavior

The parties have agreed[31] that it is "undisputed law" that:

Inmates are entitled to complain about and make criticisms of jail conditions to jail employees and officials and to outside persons and authorities so long as such complaints or criticisms are expressed in such a fashion as to pose no clear and present danger of violence and disorder.

■■■ The parties have also stipulated that most of the named plaintiffs were confined on L Section (a maximum security punishment section) of the Jail for long periods and certain of them have been placed in isolation for periods of up to almost five days. Plaintiffs allege that those plaintiffs have been so disciplined because of their participation in litigation in this case and their complaining, in ways not posing any "clear or present danger of inmate disorder,"[32] about Jail conditions and practices which they contend are unconstitutional. Plaintiffs also contend that defendants have fabricated incidents to discredit the inmates, including an alleged sit-down strike during a Baltimore City Supreme

---

29. 1/26/72 T. Tr., p. 3, which has been placed in the official court file in this case.

30. See n. 11, *supra.*

31. Pre-Trial Memorandum, p. 9a, citing Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) ; Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971).

32. Pre-Trial Memorandum, p. 7.

Bench Grand Jury tour of the Jail in 1971. At this date, this Court sees little need to examine further into the confused facts relating to that incident. But it is clear that from time to time inmates have in fact been informed by Jail officials that if they stopped petitioning and complaining they would not be deprived of opportunities for recreation, visits to the Jail commissary, and the like.[33] This Court cannot draw the line at this time as to whether there was a compelling need, given the confrontation between Jail officials on the one hand and inmates on the other hand which has existed since, if not before, riots in L Section in February, 1971, to take such steps in order to curtail further disruption within the Jail by certain pre-trial detainees. As discussed *infra*,[34] any limitations on communications by inmates with courts, counsel, family, potential witnesses, public officials, and the press should be kept at a bare and necessary minimum.[35] Further, verbalization of complaints within an institution should not be cause for punishment, at least of pre-trial detainees, unless such verbalization poses a threat which endangers the security of the institution. Jail officials need not and of course should not stand idly by while a prison's population is inflamed to riot or to disrupt the orderly functioning of the institution. At this time, it is fruitless to try to answer the chicken-and-egg question of whether in the past overly harsh repressive practices directed by Jail Officials against pre-trial and/or post-trial detainees caused the latter to create disturbances, or vice versa. Rather, there is need to pursue and develop reforms within the institution, such as the hearing system inaugurated in December, 1971, to eliminate, to the fullest extent possible, the constantly erupting confrontation which has existed.

 In addition to punishment for complaining, the records of the Jail support inmate testimony that at least several inmates have been confined in L Section, and perhaps one of them, not a named plaintiff claiming damages in this case, placed in isolation because of refusal to cut long hair.[36] Courts have generally held that regulations of state prisons establishing hair style requirements do not violate constitutional standards.[37] However, in a recent case deal-

33. This Court also finds that plaintiffs have been disciplined for complaining about quality of food, lack of or condition of mattresses, and failure to receive medication.

34. At pp. 29–32, 36.

35. The parties have agreed (Pre-Trial Memorandum, pp. 9a–10) that it is "undisputed law" that "[i]n regard to complaints and criticisms addressed to persons other than jail authorities and which are sent through the mail, it is beyond doubt that such communications are protected by the First Amendment, *See*, Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) ; Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971) ; Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970)." *But see* McDonough v. Director of Patuxent, 429 F.2d 1189, 1193 (4th Cir. 1970).

36. The parties have stipulated (Pre-Trial Memorandum, p. 9) :
Rules for inmates . . . provides that, "Inmates must be clean shaven.

Mustaches are permitted, but no beards." No mention is made in the Rules for Inmates of regulations concerning length of hair or style. Inmates who enter the jail with hair that is longer than is deemed suitable by jail authorities are given the option of getting a haircut or going on lock-up status. It is the contention of the jail authorities that the wearing of long hair invites deviate sexual advances and creates a hygienic problem.
Plaintiffs contend that long hair, beards, etc. pose no threat to hygiene if opportunity to wash and bathe at appropriate intervals is available.

37. Brooks v. Wainwright, 428 F.2d 652 (5th Cir. 1970) ; Brown v. Wainwright, 419 F.2d 1376 (5th Cir. 1970) ; Winsby v. Walsh, 321 F.Supp. 523 (E.D.Calif. 1971) ; and Blake v. Pryse, 315 F.Supp. 625 (D.Minn.1970).
The Court of Appeals for the Fourth Circuit, in a case invalidating certain *school* dress code provisions which regulated the length of male students' hair, has recently held: "[A]n individual's

ing with a pre-trial detainee,[38] the Court held that in the absence of any demonstrated threat to hygiene or any "danger to security" or the existence of any "nexus [with] * * * the ever present need in a prison to make prompt and accurate identifications of inmates," that inmate, as a *pre-trial* detainee, could not be required to shave off his beard or goatee. In this case, no health danger or identification need was shown to have existed within the Jail with regard to the style or length of hair of any pre-trial detainee who was identified as having been disciplined for failure to cut long hair. Nor does the Baltimore City Jail rule itself establish any standards with regard to long hair. If it is considered necessary for the Jail to have a policy curtailing long hair, then a definite and reasonable regulation should be adopted. While expert testimony in this case indicated that jail security and inmate rehabilitation are sometimes hampered by restrictions relating to personal behavior such as choice of hair style, this Court cannot say that it is unconstitutional for *post-trial* detainees to be required to conform to definite and reasonable hair style regulations in order to satisfy such needs and purposes as hygiene, identification, security, training, discipline and rehabilitation. But the permissible range of such regulations is far less insofar as *pre-trial* detainees are concerned.

While it may not be constitutionally necessary for a prison to establish standards for behavior and discipline, the parties have agreed that it is "undisputed law" that—

Inmates may not be punished for conduct of an innocuous or trivial nature under vague and uncertain standards and regulations because such conduct may offend the sensibilities of individual correctional officers where such conduct poses no substantial danger to the security and order of the institution. * * * [39]

right to wear his hair as he wishes is an aspect of his right to be secure in his person, a right guaranteed by the due process clause." Anderson v. Southampton County School Board, No. 71–2028 (4th Cir. April 4, 1972); Rumler v. Board (4th Cir. February 9, 1972); Massie v. Henry, 455 F.2d 779 (4th Cir. 1972). In *Massie*, Judge Winter wrote at p. 780:

> [M]any of the founding fathers, as well as General Grant and General Lee, wore their hair (either real or false) in a style comparable to that adopted by plaintiffs. Although there exists no depiction of Jesus Christ, either reputedly or historically accurate, He has always been shown with hair at least the length of that of plaintiffs. If the validity and enforcement of the regulation in issue is sustained, it follows that none of these persons would have been permitted to attend Tuscola Senior High School.*
>
> * Substantially every president of the United States serving before the time of Woodrow Wilson would also have been in violation of this regulation. After Garfield, occupants of the White House had their hair cut somewhat shorter, but Arthur's mutton chop sideburns, Harrison's full beard and the mustaches of Cleveland, Roosevelt and Taft would have been in violation of the regulation. Before Wilson, only McKinley might have passed muster. Although presidents may have responded sooner to the trend to shorter hair, older men, within the memory of some of the judges of this court, were frequently seen with their hair long enough to have been in violation of this regulation. *But see* the differing opinions in school cases decided by the several Circuits discussed by Judge Winter in *Massie*, and Karr v. Schmitt, 460 F.2d 609 (5th Cir. 1972) (8–7 en banc decision). And *see also* Raderman v. Kaine, 411 F.2d 1102 (2d Cir. 1969), holding valid such a regulation by the Army with regard to a reservist.

38. Seale v. Manson, 326 F.Supp. 1375, 1381 (D.Conn.1971).

39. Pre-Trial Memorandum, pp. 11–12, citing on a *See, e. g.*, basis, Dabney v. Cunningham, 317 F.Supp. 57 (E.D.Va.1970); Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970). *See also* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966); Landman v. Royster, 333 F.Supp. 621, 655 (E.D.Va.1971).

The parties have also stipulated (Pre-Trial Memorandum, p. 12):

> Rules for Inmates, Rule No. 13, prohibits the use of bad, foul, or loud language. No further definition of these terms is provided in the Rules. Rule No. 13 further provides that after 9:00 P.M., a quiet rule shall be in effect. The term "quiet rule" is not defined. Rule No. 21 provides that all jail personnel must be addressed formally by their last name or title. Rule No. 33 provides that all inmates shall remove their hats when entering a building. Jail records reveal that inmates have been placed on lock-up status or on isolation for offenses designated as "insubordination," "disrespect" to an officer, using foul language, "good of institution", "wise-guy", and "trouble-maker."

There was inmate testimony, and the Jail records also disclose that certain inmates were punished for "disrespect" or "causing disturbance" or the like. While those references are vague, this Court cannot at this time determine that they did not include sufficient cursing and other actions which justified disciplining. The utterances and behavior of certain of the named plaintiffs in the courtroom lead this Court to attach credence to the testimony of certain Jail officials in connection with the extreme verbal and other abuse directed at them —abuse which clearly is not compatible with rehabilitation of a convicted detainee—abuse which, from a pre-trial detainee, might well lead to such disrespect and chaos within the institution so as to endanger its security. A guard as well as an inmate is a human being with a breaking point.

▮ Nevertheless, the elimination of arbitrary disciplinary practices is required. The Warden's testimony in this case [40] is illustrative of a "theme"

to use plaintiffs' counsel's word—of a "feel" to use this Court's word—which dominated the trial and which resounds from the record in this case—namely, that the Baltimore City Jail is run on an incident-to-incident basis—that the Warden considers himself free, not in terms of any compelling necessity relating to security of the institution but on a basis of almost absolute discretion, to impose whatever punishment he deems required, even if in so doing he violates what his counsel have told him are constitutional principles. That attitude has seeped down throughout the Jail's staff. Certainly, the Warden and his staff, caught between pinched budgets and the most extreme inmate provocations, can hardly be expected to exhibit the patience of Job. But they cannot be permitted to put aside the rule of law and to deal with any inmate as a sworn enemy.[41] That is true with regard to any detainee, but particularly with regard to any pre-trial detainee. The Warden and his staff must be given superior force with which to secure the safety of the institution and to protect its staff and its inmates from physical harm, including death and brutal assault. But the Warden and his staff should use that superior force and other disciplinary and order-keeping measures only when such use is reasonably required. Certainly, precautionary, as well as post-occurrence, discipline is needed. But there is a line beyond which such discipline is not needed. That line has not been exceeded in many of the instances of which plaintiffs complain. But it has clearly been exceeded in other instances.

*Procedural Due Process*

▮▮ The parties have agreed [42] that the following is "undisputed law":

> The developing case law requires, as a matter of procedural due process

---

40. See T. Tr. of 1/26/72, in the official court file in this case.

41. *See* Landman v. Royster, 333 F.Supp. 621, 655 (E.D.Va.1971).

42. Pre-Trial Memorandum, pp. 13–14, citing on a *see* basis, Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Cluchette v. Procunier, 328 F.Supp. 767

guaranteed by the Fourteenth Amendment, that prior to the confinement of an inmate in isolation or solitary confinement cells, he is entitled to the basic ingredients of procedural due process. * * *

Essential ingredients of procedural due process are:

(1) Notice

(2) An opportunity to be heard

(3) A fair hearing

(4) An impartial decision

(5) Verbatim record of the hearing

Summary punishment, not preceded by a hearing, may be proper if:

(1) The inmate's conduct poses a serious, immediate and substantial threat to the safety of others or security of the institution, and if

(2) The circumstances are such as to demonstrate strong probability of guilt, and if

(3) Before administration of summary punishment, there is an appropriate investigation or due inquiry to assure that the punishment is not arbitrary or irrational, and if

(4) A hearing is held within twenty-four (24) hours.

The parties disagree concerning the requirements of due process when other disciplinary measures, such as revocation of visitation, exercise, commissary, shower or other rights or privileges, are taken. They also so disagree with regard to the type of hearing which should be afforded; under what circumstances certain kinds of discipline can be administered before a hearing; what notice of charges is necessary; whether representation at the hearing by a member of the staff or another inmate should be available to the accused inmate; whether such an inmate is entitled to confront accusing witnesses and to call upon the testimony of witnesses he desires to produce; and whether recording of the hearing is necessary. Many hearing attributes are provided by the policy adopted by the Jail Board on December 15, 1971.[43] Whether due process calls for hearings in instances not covered by the current regulation and whether there are constitutional deficiencies in the hearing procedure now followed requires more evidence and more consideration than has been produced or given by the parties in this case. For example, there was testimony concerning the lack of any recording device. Whether the hearing officer can be provided with a tape recorder or other recording device, which he can himself operate, as has been done in connection with many administrative hearings in non-prison settings, was only briefly mentioned. The record in this case includes descriptions of hearing procedures in Maryland confinement institutions and in prisons in other jurisdictions. This Court will not, at least in the first instance, establish additional hearing requirements for the Baltimore City Jail. Hopefully, those in charge of the Jail will give prompt consideration thereto. But even if such consideration leads to the promulgation of a code of hearing procedure in the Baltimore City Jail which is the best mankind has yet engendered, that code will be a useless memorial unless it is followed. The Jail's records themselves show that in the months of December, 1971 and January and February, 1972, hearings were not afforded to certain inmates

---

(N.D.Calif.1971) ; McCray v. Maryland, Misc.Pet. 4420 (Circuit Court for Montgomery County, Maryland November 11, 1971) ; Wayne County Inmates v. Wayne County Board of Commissioners, Civil No. 173–217 (Circuit Court for the County of Wayne, Michigan 1971).

43. Prior to December 15, 1971, there seemingly was no hearing procedure, though confinement in isolation was, apparently, under the policy, not to be imposed without an officer of the rank of captain or lieutenant approving of the same and without the inmate being given a chance to present his version of his alleged violation. However, the evidence in this case would seem to indicate that that policy was not meticulously followed.

placed in lock-up on L Section.[44] One of defendants' witnesses, a guard with the rank of captain, testified that he did not believe it necessary under the circumstances to refer those transfers to L Section to the hearing officer. In other words, the Jail Board's December 15, 1971 policy was unilaterally disregarded in the exercise of discretion by a Jail officer. That speaks for itself.

### Mail Censorship

The parties have agreed that it is "undisputed law" that—

It is constitutionally impermissible for jail authorities to withhold or delete the contents of correspondence between attorney or client. * * * [45]

The Official Jail Manual provides under the heading "Mail Censor":

Under direction of the Warden, or Deputy Wardens, the Mail Censor is responsible for the proper censoring of all incoming and outgoing mail of the inmates of the institution at which he is employed. He shall carefully acquaint himself with available information concerning each inmate and through proper study of the correspondence be able to detect any objectionable matter which may be detrimental to the security of the jail and to the morals of the inmate concerned. He shall bring to the attention of the Warden or Captains all questionable matter coming to his attention for such action as may be necessary. He shall turn over to the Finance Officer all funds or valuables delivered through the mail and immediately notify the inmate to whom directed of this receipt and disposition.[46]

Defendants contend that all mail, incoming and outgoing, can be opened and read by Jail officials. Plaintiffs claim that *no* reading of incoming mail from courts, attorneys, public officials or persons on a correspondence list is constitutional, and that no outgoing mail may be censored. A reading of the cases [47] discloses certain differences in emphasis, but the teachings of the Fourth Circuit establish that communications to and from courts should not be delayed and thus hamper the right of access of an inmate to the courts. In McDonough v. Director of Patuxent, 429 F.2d 1189, 1193 (4th Cir. 1970), Judge Winter noted that in Chief Judge Haynsworth's opinion in Coleman v. Peyton, 362 F.2d 905 (4th Cir.), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966),

44. The Hearing Officer, a Baltimore City attorney, testified fully and candidly that he could only conduct hearings in cases referred to him. The Jail's daily work sheet dated December 30, 1971 shows 182 inmates on lock-up or detention. As of February 2, 1972, 24 hearings had been held by the Hearing Officer; 4 inmates had been ordered held on lock-up; 14 confined in isolation; and 6 acquitted or not subjected to denial of privileges. No hearings were afforded to any persons continued on lock-up *after* December 15, 1971 who were so confined earlier. Some of those persons allege that they asked for hearings without success. The Hearing Officer testified that although he personally believed that it would have been advisable to afford hearings to such persons, the procedures existing at the time he testified in this case did not so provide.

45. Pre-Trial Memorandum, p. 17. *See* McDonough v. Director of Patuxent 429

F.2d 1189 (4th Cir. 1970) ; Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971) ; Jones v. Wittenburg, 323 F.Supp. 93 (N.D.Ohio 1971) ; Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970). For other cases dealing with access to courts and mail interceptions, *see* Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971) ; Sostre v. McGinnis, 442 F.2d 178, 199–201 (2d Cir. 1971) ; Denson v. United States, 424 F.2d 329 (10th Cir. 1970) ; Coleman v. Peyton, 362 F.2d 905 (4th Cir. 1966) ; McCloskey v. State, 337 F.2d 72 (4th Cir. 1964) ; Morales v. Schmidt, 340 F.Supp. 544 (W.D.Wis. 1972) ; Conklin v. Hancock, 334 F.Supp. 1119 (D.N.H.1971) ; Landman v. Royster, 333 F.Supp. 621, 657 (E.D.Va. 1971) ; Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971), aff'd, 454 F.2d 696 (1st Cir. 1972) ; Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970).

46. Pre-Trial Memorandum, pp. 17a–18.

47. See n. 45, *supra.*

"we held that undelayed, uncensored, unlimited use of the mails as a means of access to the courts was required." [47a] *But see* Sostre v. McGinnis, 442 F.2d 178, 201 (2d Cir. 1971), in which Judge Irving Kaufman wrote that "when we say there may be cases which will present special circumstances that *would* [48] justify deleting material from, withholding, or refusing to mail communications with courts, attorneys, and public officials, we necessarily rule that prison officials may open and read *all* [49] outgoing and incoming correspondence to and from prisoners." While this Court is bound by *Coleman* and *McDonough,* it does not interpret Judge Haynsworth's holding in *Coleman* or Judge Winter's use of the words "undelayed, uncensored, unlimited" in *McDonough* as being absolutes which are not subject to some residue of commonsense exception. But those opinions clearly indicate that there must exist a *very special* reason or circumstance for any mail between inmate and court being opened or censored.[50]

■■■ In the next degree falls correspondence coming into and going out of the Jail between inmate and counsel,[50a] and inmate and public official. In Palmigiano v. Travisono, 317 F.Supp. 776, 791 (D.R.I.1970), the Court held that because "the general practice in prisons throughout the United States is to allow free conversation between prisoners and their visitors" and "that officials have not found it necessary to listen to such conversations in order to thwart escapes and otherwise maintain security," "the reading of *any* outgoing mail is unnecessary and in violation of First Amendment rights of the parties involved unless pursuant to a duly obtained search warrant * * *." [51] This Court does not agree with that flat, absolute prohibition with regard to outgoing mail. There *may* be reasons why the purposes of confining a *convicted* person would require certain limitations on outgoing as well as incoming mail. There *may* be security reasons which require such mail emanating from or addressed to a *pre-trial* or a post-trial detainee to be read. It should be possible for the Baltimore City Jail Board to promulgate flexible and yet constitutional mail regulations. Such new rules are required for the future in order to eliminate the unconstitutional practices which have been followed by the Jail. These include denial of incoming and outgoing mail privileges to inmates in isolation; interception, failure to deliver and photocopying without good reason of mail by inmates with courts, attorneys, public officials, family, friends; and the reading of incoming and outgoing mail by Jail officials, on various levels who have no assigned censorship duties. The Jail, and its conditions, should not be hidden from the public.

47a. In Coleman v. Peyton, *supra* at 907, Chief Judge Haynsworth wrote:

> The right and its exercise are adequately secured in the future, we think, only if delivery to a prisoner of incoming matter from a court having jurisdiction to hear his complaints and the mailing of his communications to such a court are delayed no longer than the necessities of sorting require. Further delay for other purposes, such as censorship, seems both inappropriate and unnecessary. If a Virginia prisoner should attempt to use a Virginia court or one of the United States as a letter drop for the conduct of an unauthorized or an objectionable correspondence the court can be expected to report the matter promptly and to refuse to suffer such a perversion of its offices. Censoring takes time, and a letter at the bottom of a pile does not receive the immediate, or sometimes the prompt, attention of the censor. Pre-censorship sorting followed by the immediate dispatch of communications addressed to the courts is both becoming and essential to the avoidance of unnecessary delay. [Footnote omitted.]

48. Emphasis in original.

49. Emphasis supplied.

50. Such as, a box with a ticking noise or a package obviously containing clothes and not papers.

50a. *See* Judge Gignoux's holding in Smith v. Robbins, 328 F.Supp. 162 (D.Me.1971).

51. Emphasis supplied.

While plaintiffs' expert witnesses all expressed *policy* views against all but the most necessary mail censorship, this Court does not and cannot say absolutely and flatly that any one kind of mail censorship is completely forbidden by the Constitution. But the rules against such censorship may only proscribe the free flow of mail to and from the courts under the tightest of regulations and under clearly defined and unusual conditions, and the free flow of mail to and from attorneys, public officials, families and friends in descending degree. The unfettered exercise of discretion to open, to excise from, or to fail to deliver such mail going out of and coming into the Baltimore City Jail must end.

### Medical Conditions

The parties agree that the Jail is constitutionally required "to provide reasonable medical assistance to inmates" including a reasonable medical examination; access to sick call; treatment for special medical problems; proper dental attention; and adequate suicide prevention techniques.[52] The evidence shows that upon entering the Jail pre-trial inmates, as contrasted with post-convictees who receive more thorough examinations, answer a list of written questions relating to their medical histories, and are given partial examinations such as blood tests and x-rays, all by a nurse, but are not given anything approximating a complete intake medical examination. Though expert medical witnesses called by both sides all agreed that an intake physical examination is advisable in order to screen out drug addicts, alcoholics, and physical ailments for treatment, to avoid contagion within the prison population, and as a public health function, this Court cannot say that the lack of such an examination constitutes cruel and unusual punishment even under 1972 standards.

Plaintiffs also complain of the screening of medical complaints by guards who are not trained para-medically. The records of the Jail, and the testimony of non-inmate witnesses, corroborate the testimony of inmates that a great many of the inmates' complaints do not result in appropriate medical attention by doctors or even nurses and that *prompt* medical attention, without creating a disturbance and courting discipline, is often hard to come by. The Baltimore Grand Jury, in a 1971 report, characterized the medical staff as "slip-shod" and noted that nurses "are forced to prescribe medicines."[53] And yet it is also clear that medical complaints are often fabricated by inmates and that nurses are subjected to extreme verbal abuse and threats and share with guards and other Jail personnel the fear that pervades all who live and work within the Jail, inmate and staff alike.

Plaintiffs also complain of the absence of treatment for mental and psychological disorders, the failure to provide adequate narcotic withdrawal, alcoholic treatment, and suicide prevention programs, and the lack of attention to special medical problems. In addition, plaintiffs complain of the absence of nighttime and weekend medical coverage and of what medical experts who testified in this case stated was lack of proper emergency medical equipment in the Jail infirmary. But what pervades and overshadows medical treatment and coverage within the City Jail is the attitude of staff, medical and non-medical, toward medical complaints. Even granted that demands for medical care and appearances on sick call are grossly abused, even taking into account the attitude of a number of the inmates, there is need for a more humane approach to sick inmates—the curtailment of the use of dark medical seclusion cells—the provision of prompt attention to serious medical ills—and more prompt attention to minor ones—and of something better than the bare back of a truck in which to transport seriously ill persons to the City Hospital. This Court

52. Pre-Trial Memorandum, pp. 19–20.

53. Baltimore Grand Jury Report for the January Term, 1971, p. 4.

cannot, even in the face of the agreement of most of the medical experts who testified, say that the Federal Constitution requires the provision of any given medical equipment at the Jail rather than at a hospital or another institution not too far away, or complete intake examinations by doctors or by nurses, or screening by para-medical personnel with a specified level of training. But it does say that by 1972 standards reasonable medical care has been constitutionally absent in a number of cases. Thorough and detailed observation and guidance by unbiased and highly competent medical experts are sorely needed. Further, on an immediate basis, inmates suffering from epileptic seizures, delirium tremens, narcotic withdrawals, mental disorders or suicide attempts can no longer be routinely shackled with *iron or other metal* restraints to beds in the Jail infirmary, with resultant scarring of wrists and legs, some of which scarring was exhibited to this Court by witnesses during the course of trial.[54] There was testimony in this case from experts that when restraints are medically necessary, straps made of leather or substance other than metal should be used; and that perhaps the use of drugs would suffice and eliminate the need for restraints entirely. Some months ago, a Baltimore City Grand Jury recommended that "some means in depth drug abuse program should be administered to withdrawal addicts other than handcuffing them to the bed and using the 'cold turkey' treatment."[55] Once again, medical advice is needed, in this context, to establish medically sound programs. Once again also, this Court hesitates to prescribe or to proscribe in absolute terms. The problems faced by the doctors—even more so by the nurses—and by other staff must not be overlooked or lightly dismissed. But on an overall basis, in 1972, this Court concludes that on almost a regular recurring basis, there have

been individual cases of lack of reasonable medical assistance, and other cases of unnecessarily harsh treatment, to sick inmates which add up to cruel and unusual punishment and to constitutional deprivation.

### Food

Bad quality of prison food and the lack of appropriate dietary balance can add up to a level of constitutional deficiency.[56] The Jail Steward testified he has, of late, had about 80¢ per day to spend on food per inmate. It is of course common knowledge that institutional food, in jails and elsewhere, is seldom popularly received by the population of the institution. In the Baltimore City Jail, a principal problem is the lack of proper sanitary conditions in and around food delivery and food preparation areas and in connection with the food carts and serving utensils. The documentary evidence and the testimony of non-inmates support inmate complaints about those conditions. Once again, regardless of the materiality of budget and staff shortages and the deficiencies of outmoded and overcrowded buildings, those conditions must be weighed against an attitude by defendants which ranges from lack of interest and concern with food service deficiencies to the use of curtailment of quantity and quality of food and food service to inmates as punitive measures while they are in isolation or after riots. The expert testimony in this case that food should not be denied or curtailed as a punishment tool is noted. As to inmates convicted and serving sentences, the provision or denial of certain foods, provided there is in any event no denial of that quantity and quality of food required for appropriate nutrition, may not be unconstitutional regardless of whether it is advisable. As to pre-trial detainees, there may be special situations, such as when a pre-trial detainee

---

54. *See* Landman v. Royster, 333 F.Supp. 621, 647 (E.D.Va.1971).

55. Baltimore City May, 1971 Grand Jury Report, plaintiffs' exhibit 12.

56. *See* Landman v. Royster, 333 F.Supp. 621, 647 (E.D.Va.1971) ; Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970).

persists in throwing his food in a guard's face, when use of food curtailment is justified, again provided that appropriate basic nutritional requirements are met. But it is only in extreme situations that food curtailment may take place with regard to a pre-trial detainee. Once again, overall review by the Jail officials and the establishment of standards for food preparation, service and provision to inmates are sorely needed, as is a review of all conditions of hygiene and cleanliness within the Jail relating to housekeeping in general as well as food in particular.

### Non-Legal Visitation and Phone Calls

The parties stipulated before trial:[57]

Inmates are allowed two twenty-minute visits per week. However, visits are denied inmates on isolation and at times denied other inmates as a form of discipline. Special visits in case of emergencies and out of town visitors may be requested from the Deputy Warden.

Plaintiffs' expert witnesses all stressed the need to enable inmates to preserve family and social relationships, in terms of the inmate himself and in terms of reducing tension within the institution. The Warden himself has stated that "it is the inmate who has no visits or no one to care about him who is most likely to give authorities trouble."[58]

Plaintiffs also contend that non-legal telephone calls, while permitted under some circumstances, are unnecessarily restricted and that requests for the same are arbitrarily handled. The evidence in this case bears out those contentions. Such practices with regard to the use of telephones, and the denial of all non-legal visits and outside contacts, as a punishment measure, as occurred during a 60-day period after the February, 1971 riots, with regard to all L Section detainees, regardless of individual participation in any riot, are not only questionable as a policy matter, but raise constitutional questions in connection with pre-trial detainees. Such complete denials to pre-trial detainees may not take place unless required by security reasons[59]—reasons which have not been established in this case.

Plaintiffs also complain of the lack or infrequency of permitted non-legal visits and the fact that such visitations are conducted with a window in between to serve as a conduit for sight and as a barrier to body contact, and with a telephone connection for voice transmission. One plaintiff, fifteen years old, testified concerning the effect of his inability to touch his mother, and she him, during a visit. Yet this does not rise to the level of cruel and unusual punishment though expert testimony in this case plus available security alternatives suggest the advisability of reconsideration. Once again, it must be remembered that plaintiffs' complaints, whether they would be deemed meritorious in and of themselves by a supervisory body, executive, legislative or judicial, of the government of the City of Baltimore or State of Maryland, can be considered by this Court only within the context of violation of federal constitutional standards.

### Practices Adversely Affecting Trial Preparation and Effective Representation by Counsel

The parties have stated that it is "undisputed law" that—[60]

---

57. Pre-Trial Memorandum, pp. 24–25.

58. April 27, 1971 Staff Meeting Minutes, plaintiffs' exhibit 75.

59. *See* Jones v. Wittenburg, 323 F.Supp. 93 (N.D.Ohio 1971); Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971).

60. Pre-Trial Memorandum, pp. 25–26, citing Coplon v. United States, 89 U.S.App. D.C. 103, 191 F.2d 749 (1950); Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark. 1971); Rhem v. McGrath, 326 F.Supp. 681 (S.D.N.Y.1971); Jones v. Wittenburg, 323 F.Supp. 93 (N.D.Ohio 1971); Meola v. Fitzpatrick, 322 F.Supp. 878 (D.Mass.1971).

The right to a fair trial and effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments extends to pre-trial detainees. * * * Various conditions and practices having the practical effect of interfering with these rights are unconstitutional including: (1) interruption of mail between attorneys and clients * * *; (2) failure to provide a suitable visiting area for attorney visits * * *; (3) and failure to allow inmates reasonable access to telephones for purposes of conversing with counsel * * *.

The parties also stipulated in advance of trial:[61]

Special provision has been made in the past on occasion for criminal defense counsel to consult with their client. During the pendency of this action, counsel for plaintiffs have on occasion been refused special provision for visiting with their clients, but more recently, have been allowed to meet with their clients in a group on the section and have been allowed to have named law students interview their clients. The attorneys' visiting booth is a long narrow room through which runs a counter topped by a wire mesh screen. Booths are separated by distance of not more than 24 inches. Only a small clear plastic partition separates each attorney cubicle from the next. There are 12 to 15 seats on each side of the cubicle. There is a narrow walk-way on each side of the partition only wide enough to enable a single person to walk in or out at a time. Guards frequently pass up and down this walk-way often within a foot of the occupants.

■ Four attorneys testified in this case that the attorney-client visiting room is inadequate. Conversations between attorneys and clients are not private and can be overheard by guards, other inmates and other attorneys. The lack of any justification for such a situation only emphasizes the constitutional defect, namely, the denial of effective assistance of counsel to insure a fair trial to a pre-trial detainee. And that right extends also to all persons convicted at trial who have cases on appeal, and to those represented by counsel in post-conviction proceedings.

■ Attorneys testifying in this case have further complained of the limitation upon visiting hours—before this suit, 9:00 a. m.–11:00 a. m., 3:00 p. m.–4:00 p. m., five days per week and Saturday a. m., with no evening or Sunday hours. After this suit was filed, the week day hours were lengthened to 8:30 a. m.–11:00 a. m., 2:00 p. m.–4:15 p. m. But they are hours often not available to attorneys in trial. On the other hand, there are administrative considerations with regard to bringing inmates to and from the visiting room. No evidence in that regard was, however, produced by defendants during trial. Thus, this Court is not in a position to know whether there are solid reasons for all or any of the current restrictions. Certainly, insofar as attorney's visits are concerned, they should be facilitated—and lack of facilitation on an unreasonable basis does rise to the level of constitutional denial. The same is also true of the Jail's policy of permitting only one telephone call after admission from inmate to attorney, except in emergencies. That policy has been administered unevenly (sometimes in a more relaxed, sometimes on a more restrictive, basis) in the unfettered exercise by Jail officers of absolute discretion.

There are only a few law books available in the library at the Jail and not many more on order. The extent to which a confinement institution must provide a law library[62] states a question of implementation which an eminent three-judge court in Gilmore v. Lynch, 319 F.Supp. 105, 112 (N.D.Calif.1970), aff'd per curiam sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30

---

61. Pre-Trial Memorandum, p. 26.

62. Cf. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

L.Ed.2d 142 (1971), referred back to prison administrators for the devising of a solution. This Court hereby follows that example. The Baltimore City Jail authorities should study and take prompt corrective action with regard to all issues relating to contacts of inmates with counsel and to inmate trial preparation.

### Other Books and Literature

It has been stipulated that the Jail rules provide:[63]

> Inmates may receive non-legal literature, books, publications from the publisher only, except for books in the library and those sold in the commissary.

■ The First Amendment affords the right to each adult to read at least in his home what he chooses.[64] In a prison setting, the elimination of some reading matter may be required for security reasons because it is designed to cause severe disruption (as for instance an illustrated pamphlet instructing a prisoner how to destroy jail property or how to interrupt or close down certain jail services and programs). In the case of a post-convictee, some reading matter may be damaging to the program deemed best for his rehabilitation. On the other hand, the desirability of permitting any prisoner to occupy himself in reading is self-evident. Further, since the Constitution does not stop at the gate of the prison, and since First Amendment rights are among the last to be set aside or limited by balancing considerations such as institutional security, there must be very good reason for restricting the supply and use of literature to any inmate, particularly a pre-trial detainee who, to repeat, is neither subject to rehabilitative measures, nor discipline except to the extent necessary to insure attendance at trial and to maintain security. While the publishers-only rule may somewhat simplify the inspection of incoming books and make it easier to determine whether they contain any items such as weapons and drugs, the presence of which in the Jail must be forbidden, it is difficult to understand why families and friends and retail stores should not be permitted to mail or deliver books, magazines and newspapers to the Jail, to be given to the inmates for whom they are intended, after inspection under carefully drafted and evenly administered rules, including, if necessary, the stripping of bindings into which weapons or other contraband could be inserted. Such rules should also relate to the type of literature available for purchase at the prison commissary. The operator of that commissary testified in this case that he exercised, on the basis of what would appear to be largely rules of thumb, supervision to exclude certain books including those appealing too greatly to prurient interests.[65] With a little thought, a better system can be and should be devised because here we are dealing not only with the policy considerations favoring availability of reading material but one of the most precious of constitutional rights.

The prison library is sparsely stocked. The use of the library is, to put it mildly, not great. Certain prisoners, such as those on L Section, are not allowed to visit the library. Little or no effort is made to circulate books. On the other hand, there is ample evidence that all kinds of Jail property are often used as weapons or instruments of escape or are destroyed by inmates for the sheer sake of destruction, or hampering Jail administration. Even television sets provided for inmate use have been so treated. And books are no exception. Nevertheless, there is constitutional need for further study by the officials of the Jail. The indigent inmate who wants to read should be given that opportunity both in

---

63. Pre-Trial Memorandum, p. 28.

64. *See* Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

65. The evidence in this case lacked specificity in that regard.

terms of reading material and adequate reading conditions.

On a beautiful sunny Saturday morning last spring, after this case was filed, I visited the Jail in company with counsel on both sides and was courteously and without hurry escorted by the Warden and other members of his staff around the institution. The Warden knew of the visit approximately twelve hours before it occurred. There have been prisoner accusations of a quick clean-up before the visit and there was indeed some evidence of last minute attention in that direction. But there were no smells from over-use of cleaning fluids or the like to indicate that this Court did not get a rather true picture of the physical condition of the institution. One of the images which I carry from that inspection is of the semi-darkness in the cells with bright sunlight outside and of the meager and dim electric lights in the cells which provided not much more reading light for the cell-confined reader than was available to Abraham Lincoln in his boyhood. The task that the Warden and his staff face in handling inmates, whether they be pre-trial detainees or post-trial convictees, is formidable. But those inmates are human beings. Their behavior may sometimes explain the appellation of "animals" which the Warden utilizes on occasion when speaking of them. But even if they act like animals, they are still human beings, entitled, as each of us is, to the shield of our Federal Constitution. The availability of and the right to have access to books and other literature is one such right that may not be lightly brushed aside. One outgrowth of the publishers-only rule was the imposition of about a week's solitary confinement upon a college-age girl, charged with destruction of campus property, because with knowledge that she was breaking a prison rule she accepted from a friend who came to visit her, and tried to hide and retain, a book entitled A Black Woman Searches for God.[66] The Jail records show that the Warden, in writing, approved her confinement, noting she was a "known revolutionist." That young lady testified in this case. This Court is under no illusions about her attitudes. But the young lady wanted to read. There is no evidence in the record or available to this Court to show that the book which her friend brought to her would have created by its presence within the institution any more danger to the Jail's security than existed without it. Subject to its initial inspection, that book should have been made available to the girl unless there was reason to believe that the book's presence in the Jail was reasonably calculated to endanger its security.

■■■ Some of the experts who testified in this case have suggested that repression begets aggression. Yet it must also be admitted that sometimes aggression necessitates stern disciplinary measures. When such measures are necessitated in order to maintain institutional security, is the key question.[67] And the burden in that regard is most

---

66. The girl testified she thought the author was George Bernard Shaw. This Court's research would indicate the author is Mia Brandel-Syrier.

67. There is evidence that for more than a day after one of the February, 1971 riots in L Section, there was no water for inmates to use in washing tear gas from their eyes other than the existing water in toilets. There is no evidence that such lack of provision of any water was dictated by requirements of prison security or safety of Jail personnel. On a lesser level, there is much evidence that denial or curtailment of showers has often been utilized as a punishment measure. Such denial must be viewed in the light of the doctrine that a disciplinary measure validly imposed for one offense may not be invoked if its imposition is disappropriate to another offense. Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1972); Gallego v. United States, 276 F.2d 914, 917–918 (9th Cir. 1960).

applicable when suppression of literature and other reading material—and thus curtailment of First Amendment rights—is involved. The case law speaks loudly in establishing the heaviness of that burden.

■ The evidence indicates that the daily Baltimore newspapers are at times not available for sale at the commissary or are kept from the Jail, or if allowed in, have excised from them articles critical of or pertaining to conditions within the Jail. Such restrictions must be affirmatively justified even for a prison housing few if any pre-trial detainees. Such justification must be greater, to pass constitutional muster, when the institution is the Baltimore City Jail with an inmate population, 80% plus of which is composed of pre-trial detainees.

■ Complaints concerning availability and circulation of such items as *Muhammed Speaks,* the Black Muslim publication, or the Black Panther Party Paper, also need reexamining to see if prison security requires their exclusion, *see* Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971).[68] Little or no evidence was presented at trial showing such necessity though the regulations of other Maryland institutions, as well as the case law, would indicate that in some instances there exists, and in other instances there does not exist, such necessity. More detailed standards governing such determinations are required.

### Religious Freedom

■ Under the heading "Undisputed Law" the parties agreed before trial:[69]

It is well established that inmates are entitled to freedom of religion guaranteed by the First Amendment. While it is recognized that it may not always be practicable to treat members of all religious groups with strict equality, the right to hold religious services must be extended to all religious groups. * * *

The parties also so stipulated as fact:[70]

Religious services are generally conducted every Sunday. Catholic, Protestant and Islamic services are conducted separately. Inmates on lock-up and isolation status are denied the right to attend.

The evidence at trial showed that religious services are regularly held. Dissatisfaction by two Catholic priests because of the lack of provision for private consultation was expressed. There would seem little reason why that lack cannot be handled without endangering institutional security. Clearly, it should be reexamined with an eye to cure. So should all restrictions upon attendance by any inmate of the religious services he wishes to participate in. Again, First Amendment rights are at stake.

### Equal Protection

Before trial, the following facts were stipulated:[71]

All inmates at the jail, except those who have not been granted bail, are confined pre-trial because they were without the necessary funds to make bail. Bail decisions are made by State Judges and Maryland District Court Commissioners. The Warden of the

---

68. *See also* Rowland v. Jones, 452 F.2d 1005 (8th Cir. 1971) ; Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) ; Walker v. Blackwell, 411 F.2d 23, 28–29 (5th Cir. 1969) ; Long v. Parker, 390 F.2d 816, 822 (3d Cir. 1968) ; Conklin v. Hancock, 334 F.Supp. 1119 (D.N.H. 1971) ; Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971) ; Sostre v. Otis, 330 F.Supp. 941 (S.D.N.Y.1971) (Mansfield, J.), involving, *inter alia,* Selected Writings of Mao Zse Tung; Rowland v.

Sigler, 327 F.Supp. 821 (D.Neb.1971) ; Seale v. Manson, 326 F.Supp. 1375 (D. Conn.1971) ; Davis v. Lindsay, 321 F. Supp. 1134 (S.D.N.Y.1970) ; Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970).

69. Pre-Trial Memorandum, p. 29.

70. Pre-Trial Memorandum, p. 30.

71. Pre-Trial Memorandum, pp. 30–31.

jail detains only pursuant to a court order. These inmates are not, with a few exceptions, allowed to come into contact with or participate in any program or utilize any resources of the following type:

a. Work-release program.

b. Educational-release program.

General education or other programs at the jail do exist as follows:

a. There exists an educational program for youngsters in the Baltimore City Jail, juveniles who have been waived to adult jurisdiction. This educational program is staffed by three men who teach about fifteen inmates each. The program is not compulsory nor has it been in existence for more than six or seven months.

b. There is some on-the-job training in way of training inmates in painting skills, machine shop skills, working in the kitchen and hospital. These programs are for convicted inmates only.

The defendants have stated, *inter alia:* [72]

The fact that an inmate cannot raise bail set by the State Judiciary or is not bailable means that said inmate *is considered by the law to be highly dangerous to persons and property,* is a threat to society and should be incarcerated pending disposition of his trial, and that if the elaborate and presently exhaustive machinery of the State Judiciary does not consider a man a good risk for bail, then the Defendants, as prudent reasonable men, have a duty to act accordingly.

This Court does not agree with all aspects of that position. Many a pre-trial detainee may well be no more "highly dangerous to persons and property" or a greater "threat to society" than his fellow defendant who has the economic wherewithal to make bail. The leader of an organized criminal syndicate is thus to be compared and contrasted with the petty-thief. And this is true even under an effective and liberally administered pre-trial release program.

Still, a pre-trial detainee, no matter why he is held in the Jail, must of necessity suffer some loss of liberty which the defendant on bail enjoys. Plaintiffs complain of the lack of educational facilities for adults and the meagerness for youthful inmates of such programs, and of the need for many more recreational programs. Some increase in the latter has occurred since this suit was filed. Budgetary and staff shortages again are involved. Judge Hammerman's statement that the "general atmosphere" for juvenile inmates "is one of almost total inactivity by young persons in miserable surroundings" [73] is all too true of the Jail in general.

Plaintiffs sought originally in this suit to have this Court establish a maximum period for pre-trial detention. Defendants produced evidence to show the efforts being made by the Supreme Bench of Baltimore City to speed up criminal trials, particularly of those defendants held in confinement. Plaintiffs, in the end, dropped their quest for any flat rule setting a maximum pre-trial detention period. Any such rule must be developed either by the state courts, or at least on a case-to-case basis. Nevertheless, the longer the pre-trial detention period, the more that constitutional principles of equal protection dictate the need to improve the lot of the pre-trial detainee in the City Jail as compared with his fellow defendant at liberty awaiting trial. Better conditions relating, *inter alia,* to sanitation, medical care, visits, contact with attorneys, reading facilities, recreation and education, if desired, become even more constitutionally mandated as the pre-trial

---

72. Pre-Trial Memorandum, p. 31a.

73. Opinion of Judge Robert I. H. Hammerman of the Supreme Bench of Baltimore City, dated August 3, 1971, p. 9.

detention period of the inmate is extended. Plaintiffs contrast those facilities and programs, or the lack of them, at the Jail with those in other Maryland prison institutions. But the latter, housing inmates for longer stays, and charged with rehabilitation, are provided with the opportunity of more time, and with more money and staff, and are hardly to be compared with a jail housing mostly pre-trial detainees. Nevertheless, the comparison is chillingly unfavorable to the Jail, even recognizing those factors. And, in any event, there is no excuse for a general policy of not supplying indigent inmates with such hygienic necessities as toothbrushes and toothpaste for all, and sanitary items for women. Testimony revealed that about $100 per year is spent on distributing about 250 toothbrushes and 250 tubes of toothpaste to more than 18,000 inmates who pass through the Jail annually. Not all of them are indigent. But many are. Some of them will destroy or misuse anything, not only bedclothes and towels and books, but toothpaste, shaving cream, combs and brushes. Defendants produced in the courtroom during trial an array of items, some torn from the building structure itself, some twisted or otherwise transformed into patterns inconsistent with intended use. But there was no evidence produced to lead one to think that many of the inmates misuse basic hygienic articles, paper, pencils, stamps, envelopes, socks and underwear, all of which they, except in the rarest of cases, must do without unless they have funds to purchase them at the commissary, receive them from family or friends on the outside, or borrow them from fellow inmates. There may be a few persons who must in the name of security be denied such items as well as mattresses, blankets and towels, but despite the high destructive use of the latter, no evidence was produced to show why the Baltimore City Jail cannot develop a program which insures to most of its inmates treatment more similar to that in other Maryland confinement institutions, and less starkly different, in the case of pre-trial detainees, from the freedom enjoyed by pre-trial detainees on bail.[74]

## Conclusion

This Court is aware that since the conclusion of the trial of this case, during the period in which counsel submitted proposed findings of fact and legal memoranda and in which this Court prepared this opinion, a federal inspector's report covering the Jail has been received by city officials,[75] and that the Mayor has appointed a special committee to consider and to make recommendations concerning the present operation of the Jail. Particularly under those conditions but also in the light of this Court's strong belief that those charged with administration and funding of the Jail should be given the opportunity, at this time, promptly to formulate and to enforce rules, regulations and practices replacing those of the past which have constituted violations of our Federal Constitution, this Court, at this time, directs counsel to consider this opinion and to be ready to meet with this Court not later than one week from the date hereof to discuss the preparation of an interim decree as required by the views set forth in this opinion. That interim decree, *inter alia,* will establish a time schedule pursuant to which those unconstitutional practices will be eliminated.

---

74. *See* Anderson v. Nosser, 438 F.2d 183 (4th Cir. 1972) ; Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971) ; Jones v. Wittenburg, 323 F.Supp. 93 (D.Ohio 1971) ; Holt v. Sarver, 309 F.Supp. 362, aff'd, 442 F.2d 304 (8th Cir. 1971).

75. Plaintiffs' counsel suggested to defendants' counsel that that report be made available to this Court. As was their right, defendants' counsel objected, pointing, *inter alia,* to the lack of opportunity for cross-examination.