William L. McDONOUGH, Appellant,

v.

DIRECTOR OF PATUXENT, Appellee.

No. 13185.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1970.

Decided Aug. 10, 1970.

4.

12

13

21

Richard J. Bonnie, Charlottesville, Va. (Court-assigned counsel), for appellant.

Alfred J. O'Ferrall, III, Asst. Atty. Gen., of Maryland (Francis B. Burch, Atty. Gen., of Maryland, on the brief), for appellee.

Before HAYNSWORTH, Chief Judge and WINTER, Circuit Judge, and RUSSELL, District Judge.

WINTER, Circuit Judge:

Once again, we are asked to examine the question of what are permissible restrictions on correspondence by an inmate of a penal or correctional institution with persons and organizations on the outside. Plaintiff sued, under 42 U.S.C.A. § 1983, to have removed an absolute ban on his correspondence with a national magazine, its legal representatives and a psychiatrist whom plaintiff sought to interest in his case and to remove restrictions on his correspondence with his local attorney. He alleged that the purpose of the correspondence was to seek psychiatric, financial and legal assistance for a redetermination hearing as to whether he was a defective delinquent under Maryland's Defective Delinquent statute, Ann.Code of Md., Art. 31B §§ 1 *et seq.* The district judge granted a motion to dismiss. Since he relied in part on an affidavit supporting the motion, which in the alternative prayed summary judgment, we treat the dismissal as a grant of summary judgment. Rules 12(b) and 56, F.R.Civ.P. We reverse and remand for further proceedings.

## I

Plaintiff was convicted of assault and battery in the Circuit Court for Baltimore County in 1959 and sentenced to two years' imprisonment. Three years later, he was found to be a defective delinquent. He was committed to Patuxent Institution for an indeterminate period. During the next five years he sought unsuccessfully to challenge the validity of the underlying criminal conviction, the constitutionality of the defective delinquency law, and the validity of his commitment thereunder.[1] His first effort to obtain a redetermination of his defective delinquency status in order to have himself declared no longer a defective delinquent was decided adversely to him.

In the fall of 1967, in anticipation of a second redetermination hearing to which he was entitled by statute,[2] plaintiff communicated with numerous independent psychiatrists, requesting private psychiatric evaluations and testimony. Included was Dr. Thomas Szasz, of Syracuse, New York. Dr. Szasz indicated some interest in the case and in testifying, but he inquired whether plaintiff had counsel and suggested that plaintiff communicate with the American Civil Liberties Union. In a later letter, Dr. Szasz evidenced continuing interest in the case but noted that his fee would be $500 per day for at least a two-day period. He suggested that to mitigate this expense he would "first try to enlist the assistance of some others." Dr. Szasz requested permission to use plaintiff's correspondence in soliciting the aid of the "New York Civil Liberties Union or Playboy Magazine, etc."

A month later, after plaintiff had instituted his redetermination proceedings, Dr. Szasz urged plaintiff to postpone his legal action because Dr. Szasz had other currently pressing obligations and was not immediately available to testify. He suggested, however, that plaintiff communicate with Mrs. Patricia Counts, an out-of-state attorney for Playboy Magazine, for legal assistance. He noted that Playboy had responded favorably to his own inquiries and was planning to use plaintiff's letters to Dr. Szasz to appeal to its readership for funds with which to aid plaintiff. He sent plaintiff for signature a form authorizing the publication of the earlier letters.

Plaintiff signed the form and attempted to post it. On orders of the Director of Patuxent, the mail clerk returned the correspondence to plaintiff and the Director prohibited any further correspondence with Dr. Szasz and Playboy Magazine or its representatives. Subsequently, plaintiff was not allowed to give his retained local attorney a power of attorney to authorize publication of the letters. In an affidavit filed in support of the motion to dismiss or in the alternative for summary judgment, defendant asserted that this absolute prohibition would be amended "in that the inmate will henceforth be permitted to conduct such correspondence insofar as the same may relate to Dr. Szasz's possible participation in McDonough's pending redetermination hearing or other legal proceedings; * * * however, any mail from the said McDonough to Dr. Szasz or anyone else, which contains authorization for the publication of his correspondence in Playboy or any other magazine, for which publication institutional approval has not been granted, will, absent a judicial mandate to the contrary, be promptly returned to the inmate."

When plaintiff was prohibited from transmitting the form of authorization for publication and from giving his local attorney a power of attorney, this suit

---

1. McDonough v. Director of Patuxent Institution, 229 Md. 626, 183 A.2d 368 (1962); 229 Md. 642, 184 A.2d 623 (1962); 237 Md. 645, 207 A.2d 95 (1965); and 3 Md.App. 539, 240 A.2d 322 (1968).

2. Ann.Code of Md., Art. 31B § 10(a) permits an application for a redetermination of defective delinquency after the expiration of two-thirds of the original sentence but not less than two years. Section 10 (b) permits applications thereafter at three-year intervals.

followed. In addition to the facts previously set forth, plaintiff alleged that his letters to Dr. Szasz did not criticize the administration of Patuxent Institution and that their publication would not have had a disruptive effect on either prison discipline or the orderly progress of judicial proceedings. His sole purpose, he averred, was to appeal for legal and financial assistance.

These allegations were denied in the affidavit. There, it was stated that plaintiff's correspondence with Dr. Szasz constituted a critique of the defective delinquency law and its implementation at Patuxent Institution. The affidavit also asserted that "in the exercise of administrative judgment, it was determined that such a publication might have an adverse effect upon institutional control and discipline, the treatment programs available therein, and, in general, upon the population committed to Patuxent * * * that such a publication might tend to interfere with the orderly progress of certain judicial proceedings pending," and that for these reasons "a decision was made by the Patuxent authorities to prevent [plaintiff] * * * from securing the publication in Playboy of his critique and to proscribe any direct or indirect means of achieving such publication."

## II

■ The decisions of this Court establish that one who is put behind prison walls does not automatically surrender all rights. Our prior decisions recognize that "a right of access to the courts is one of the rights a prisoner clearly retains. It is a precious right, and its administratively unfettered exercise may be of incalculable importance in the protection of rights even more precious." Coleman v. Peyton, 362 F.2d 905, 907 (4 Cir.), cert. den., 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966). This right, we have recognized, carries with it the right to seek and obtain the assistance of competent counsel so that the assertion of legal claims may be fully effective. Coleman v. Peyton, 340 F.2d 603 (4 Cir. 1965); McCloskey v. State of Maryland, 337 F.2d 72 (4 Cir. 1964). In Coleman (362 F.2d 905), we held that undelayed, uncensored, unlimited use of the mails was necessary to secure the right. In Coleman (340 F.2d 603), and McCloskey we recognized that the right to counsel carried with it the right to use the mails to obtain and communicate with counsel.

■ Where, as in the instant case, the issue ultimately to be litigated in the judicial forum is whether plaintiff is still a defective delinquent, we have no hesitancy in saying that the inmate's rights include the right to seek and obtain psychiatric assistance and testimony. A contested redetermination of defective delinquency is essentially a battle of experts. Cf. Sas v. Maryland, 334 F.2d 506, 511 (4 Cir. 1964).[3] The Maryland statute makes no provision for furnishing a psychiatrist of his own choosing at state expense to an indigent inmate to assist him in a redetermination hearing, although such aid is supplied at the time of the original determination of defective delinquency[4] and although, administra-

---

3. Since it is true that the state, to show continued defective delinquency, need not introduce any new evidence or perform a contemporaneous evaluation but may rely on records of prior "antisocial activity," Rice v. Director of Patuxent Institution, 238 Md. 137, 207 A.2d 616 (1965), and prior convictions and upon the original determination, McCloskey v. Director, Patuxent Institution, 4 Md.App. 581, 244 A.2d 463 (1968), the burden to prove the discontinuance of defective delinquency rests upon the inmate. From its very nature, the issue is socio-medical, and re-covery may be proved only by qualified experts. Not to denigrate the role of counsel, private psychiatric assistance is the functional equivalent of access to legal assistance in an ordinary judicial proceeding.

4. Ann.Code of Md., Art. 31B § 7. Even so, § 7(b) requires the psychiatrist's report to be submitted to the court. The defendant has no control over his report and no doctor-patient relationship is established. Savage v. Director, Patuxent Institution, 5 Md.App. 1, 244 A.2d 899 (1968).

tively, Maryland has sought to remedy this deficiency in the statute by making a modest allowance to privately engaged psychiatrists.[5] The right to obtain psychiatric assistance and testimony, to have meaning, must, therefore, be deemed to include not only the right to use the mails to recruit, consult with and communicate generally with a psychiatrist or psychiatrists, but also to seek financial assistance to make the employment of a psychiatrist possible.

While in *Coleman* (362 F.2d 905) we held that undelayed, uncensored, unlimited use of the mails as a means of access to the courts was required, we have not taken such a sweeping position with regard to other types of communication. In *McCloskey,* the inmate, who held pronounced anti-Semitic views, claimed the right to correspond with members of Congress, the state legislature, lawyer groups and the American Civil Liberties Union to express those views, to register complaints and to request legal assistance. We rejected the plea because we found no evidence that the inmate had been denied access to the courts or that he had ineffectually sought counsel where he had a cause of action to be asserted. We recognized that "[b]ecause prison officials must be responsible for the security of the prison and the safety of its population, they must have a wide discretion in promulgating rules to govern the prison population and in imposing disciplinary sanctions for their violation. * * * While an inmate * * * should be allowed a reasonable and proper correspondence with members of his immediate family and, at times, with others, it is subject to censorship to be certain of its reasonableness and propriety. A broader correspondence is subject to substantial limitations or to absolute prohibitions. Control of the mail

to and from inmates is an essential adjunct of prison administration and the maintenance of order within the prison." 337 F.2d at 74.

### III

■ These principles govern the decision of this case. If, as plaintiff alleges, the purpose of his correspondence with Playboy Magazine, Mrs. Counts, Dr. Szasz and his local attorney was to obtain psychiatric, financial and legal assistance for his redetermination hearing, he alleged a good cause of action. His right to correspond with them is not unlimited, however; and if, as defendant claims, the purpose of the correspondence was to effect publication of a critique of the defective delinquency law and its implementation at Patuxent with deleterious effect upon institutional control and discipline, treatment programs and other inmates, the administration of the institution would not be powerless in its discretion to suppress it. Not only might such publication in a national magazine adversely affect institutional control and discipline because of the apparent defiance and critical attitude of one of its inmates—word of which would surely reenter the institution and reach other inmates, it might also have a deleterious effect on plaintiff's forthcoming jury trial in his redetermination hearing,[6] as well as the jury trials of other persons who are claimed to be defective delinquents[7] or who are also seeking a redetermination of their status. It should not be concluded that because we recognize the overriding institutional interest and the interest of other inmates, including plaintiff, in prohibiting a defendant from selling a story about the institution, or about himself, any real complaint about the administration of the institution or the treatment of plaintiff may go unredressed. Plain-

---

5. During argument we were told that the usual allowance is $100, but that as much as $250 has once been granted.

6. Ann.Code of Md., Art. 31B § 10 permits an inmate to pray a jury trial for redetermination of defective delinquency.

7. Ann.Code of Md., Art. 31B § 8 permits a jury trial at the instance of the defendant, the state or the court at the initial determination of defective delinquency.

tiff's continuing right of access to the courts, his right to effective and competent counsel to present his grievances and the willingness of the courts to consider his complaints are a sufficient answer to any such implication. *Cf.* Sas v. State of Maryland, *supra.*

## IV

The case presents unresolved issues of fact. The letters that plaintiff wishes to have published are not before us. Their possible effect on the administration of the institution and the fairness of plaintiff's redetermination trial or the trials of others cannot be assayed. Without them, the validity of the application of the amended order which prohibits any publication "for which institutional approval has not been granted" cannot be determined. In short, proper disposition of the case in the light of the principles stated herein can be made only after a trial at which evidence is received and questions of credibility resolved. The case is not one for summary disposition.

We reverse the judgment of dismissal and remand the case for further proceedings.

Reversed and remanded.