Norman S. SYKES, III, et al., Plaintiffs,

v.

Ralph KREIGER et al., Defendants.

Civ. A. No. C71–1181.

United States District Court,
N. D. Ohio, E. D.

May 15, 1975.

Edward R. Stege, Jr., Glenn E. Billington, Cleveland, Ohio, for plaintiffs.

Malcolm C. Douglas, Cleveland, Ohio, for defendant City.

Timothy J. Gauntner, Asst. County Pros., Cleveland, Ohio, for defendant County.

## ORDER

KRUPANSKY, District Judge.

This action was commenced by eleven named plaintiffs seeking relief for themselves and a class similarly situated for violation of constitutional rights alleged to arise as a result of the conditions and operation of the Cuyahoga County Jail.

Jurisdiction of the Court is premised on 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 1343(3) and (4). Only injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 is sought.

Plaintiffs and the class they seek to represent are persons confined at the Cuyahoga County Jail, Cuyahoga County, Ohio, for reasons other than as punishment resulting from a conviction of a criminal offense. The class also seeks to include those persons who will be confined at said facility in the future.

The Court has previously reserved ruling upon a motion for certification of this suit as a class action. It is now apparent, however, that a class action is proper. All prerequisites to a class action have been met: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and/or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(a), Fed.R.Civ.P. Further, the requirements of Rule 23(b)(2) have been satisfied since plaintiffs seek only injunctive and declaratory relief and the defendants have acted or refused to act on grounds generally applicable to the class.

Accordingly, the suit will proceed as a class action and include all persons confined or who will be confined at the Cuyahoga County Jail.

Counsel for the respective parties in cooperation with the Court have resolved innumerable controversial issues initially presented by the pleadings herein as is evidenced by this Court's Order dated March 18, 1975. Presented for resolution by the Court are the following remaining questions:

1. The maximum population of the jail;
2. The lack of psychiatric care for inmates;
3. The right of an accused inmate to confront and cross-examine his accusers at disciplinary hearings;
4. The right of an accused inmate to have counsel-substitute at disciplinary hearings;
5. The right of an inmate to send and receive mail while in isolation;
6. The right of an inmate to be notified when a magazine or newspaper sent to him is rejected;
7. The number, timing and procedure for inmate telephone calls;
8. The number, timing and procedures for visits, including the persons allowed to visit;
9. The right of law students, investigators, and other agents of attorneys to visit inmates.
10. The content and use of the jail library.

The immediate attention of the Court is directed to the keystone issue, i. e., maximum population of the jail, upon which resolution of a number of the remaining collateral controversies depend.

Apparent from the pleadings, evidence, exhibits, briefs and arguments of counsel, the existing overcrowded condition in Cuyahoga County Jail is conceded. The facility, completed in 1930, was designed to accommodate less than 300 male and female pretrial and post-conviction detainees. The population history of this detention facility during the three years last past reflects the following comparative monthly variances.

| Month | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| January | 738 | 503 | 475 | 581 |
| February | 715 | 543 | 450 | 580 |
| March | 647 | 541 | 479 | 550 |
| April | 565 | 575 | 473 | |
| May | 579 | 575 | 473 | |
| June | 563 | 473 | 431 | |
| July | 545 | 475 | 448 | |
| August | 486 | 475 | 469 | |
| September | 517 | 418 | 598 | |
| October | 480 | 447 | 615 | |
| November | 507 | 397 | 637 | |
| December | 475 | 525 | 553 | |

(Plaintiff's Ex. 17).

The expert testimony of architect, Philmore J. Hart, disclosed existing minimum contemporary standards for inmate sleeping areas in penal institutions with ever present security problems to be 55 square feet and 400 cubic feet per person.

Prevailing conditions at the County Jail provide between 13 and 35 square feet and 140.2 cubic feet sleeping area per inmate, well below the present day accepted stan-

dard. Applying the above criterion, the maximum acceptable per floor inmate assignment compared with actual per floor inmate assignment as of March 19, 1975, reflects the following:

| Floor | Actual Inmates Assigned Each Floor as of 3/19/75 | Maximum Allowable per Criterion |
|---|---|---|
| 4 | 65 | 50 |
| 5 | 172 | 60 |
| 6 | 131 | 36 |
| 7 | 70 | 39 |
| 8 | 100 | 80 |
| 9 | 24 | 22 |
| | 544 Total | 287 Total |

The evidence disclosed that as of March 22, 1975, 114 occupants of the jail were individuals other than county detainees. The number of non-county inmates is usually greater. The following reflects a cross-section of individuals confined within the facility by remanding authority:

| | |
|---|---|
| 7 | parole violators (State) (average per month 15–20) |
| 27 | probation violators (County) |
| 16 | Federal prisoners |
| 4 | Military (average per month 20–25) |
| 4 | Material witnesses (County) |
| 1 | Other authority |
| 25 | Municipal Court (Mitimus) (Cleveland) |
| 65 | Municipal Court (Suburbs) |
| 9 | Juveniles (Juvenile Court) |
| 195 | County prisoners |
| 147 | Bound over Grand Jury from Municipal Court (County) |
| *57 | Institutionalized felons. (State) |

It would appear from the foregoing that 20.9%, or at times a greater percentage, of the jail's detainees are remanded by federal, state, municipal, or juvenile authority and are held at said facility pending disposition of the individual case by the remanding authority. Twenty-five or approximately 5% of the total population of the jail facility are female prisoners.

Evidence presented by the Cuyahoga County Sheriff discloses that the 8th floor area of the jail, presently assigned for detention of female prisoners, is physically

most suitable for conversion into psychiatric holding cells and treatment areas for inmates suffering from mental disorders, including persons with general suicidal tendencies or in either manic or psychotic states.

· A reduction of the jail population and implementation of a program for more humane detention of emotionally disturbed and advanced psychotic prisoners is realistically attainable through use of a satellite facility designed to detain the displaced female prisoners, non-county detainees, and low security risk inmates, thus reducing the total jail population at any given time to a more desirable level of less than 375 inmates.

The evidence has disclosed that the County Commissioners have considered the creation of such a permanent satellite facility as a detention center for low security risk detainees to be operated as an adjunct to the new County Jail facility presently under construction at the Justice Center. The City of Cleveland, Warrensville Workhouse situated in Warrensville Township is currently available as a location for such low security institution. Realization would result in immediately reducing the jail population to its intended design capacity.

In an effort to provide an orderly implementation of attainable results without unduly taxing the efforts and resources of affected political subdivisions, It Is ORDERED that:

1. The Fifth and Fourteenth constitutional amendment infringements resulting from prevailing conditions at the Cuyahoga County Jail arising from the inordinately excessive number of inmates incarcerated at the facility cannot be permitted to continue into the future;

2. The total number of inmates to be confined within the County Jail situated at 1560 East 21st Street, Cleveland, Ohio, at any given time subsequent to September 30, 1975, shall not exceed 375 individuals;

---

* Convicted felons sentenced to state institutions but returned by Court Order to the Cuyahoga County Jail as material witnesses in other proceedings, conferences with their attorneys or other similar reasons.

3. The defendants herein including the City of Cleveland shall present to the Court by not later than June 30, 1975, a joint comprehensive plan designed to reduce the population of said institution within the period hereinbefore designated, i. e. September 30, 1975.

Of equal importance and immediate concern to the Court is the plight of psychiatric inmates detained at Cuyahoga County Jail.

The magnitude of the crisis evolving from the detention of inmates with advanced mental and emotional disorders is forcefully articulated by Amasa B. Ford, M. D. in his 1973 report to the Administration of Justice Committee resulting from its commission to a board of medical examiners composed of Amasa B. Ford, M. D., Associate Professor of Community Health and Medicine, Case Western Reserve University, Harold B. Houser, M. F., and Edgar B. Jackson, Jr., M. D., Departments of Community Health, Biometry, and Medicine, Case Western Reserve University School of Medicine, to conduct a study of medical care and treatment of inmates at Cuyahoga County Jail wherein he stated:

. . . Mental disorders were considered to be present in almost half the subjects and comprised a fourth of the total problems. There was no significant difference in the proportions of subjects with mental disorder problems among the three groups, males under 45, males over 45, and females. One-third of the mental disorder problems were neuroses, about one-fourth were considered as possible psychoses, another one-fourth were related to drug dependence and the remainder were personality defects or alcoholism.

*Health Status of Prisoners in Cuyahoga County Jail and the Indications for Health Care* at p. 8 (Plaintiff's Exhibit 15B).

Dr. Stacey A. Besst, M. D., the County Jail physician, emphasized the conclusions of the Ford Report by disclosing that no cells were presently available for proper confinement of inmates suffering severe mental disorders, general suicidal tendencies or persons in either manic or psychotic states. He revealed further that no procedures or personnel are presently available to detect, evaluate, observe, consult or treat such individuals, thus further jeopardizing the security and safety of the jail, the afflicted prisoner and his contemporary associates.

The Court concludes from the evidence that the City of Cleveland, by its ownership and control of the Warrensville Workhouse, is an indispensable party to this action since the Workhouse represents the single immediately available facility to provide the locus for implementing this Court's Order in a pragmatic, orderly, feasible and efficient manner within the time-frame dictated by the continuing constitutional infringements impressed upon inmates of County Jail as hereinbefore discussed. Complete relief, however, cannot be accorded by the county defendants alone without good faith participation by the City of Cleveland, whose interests are so directly related to the subject matter of this action through the interrelationship of its municipal court system with that of the Cuyahoga County Common Pleas Courts, the remanding authority derived therefrom, and the number of individuals Cleveland courts remand to the custody of County Jail that its absence as a party hereto could impair or impede its ability to protect its interests herein. The City of Cleveland is subject to the service of process of this Court without depriving it of jurisdiction of the subject matter of this action and the Court has therefore ordered its joinder.

In support of its Order joining the City of Cleveland and the State of Ohio for purposes of formulating and affecting the remedies designed to correct existing and future constitutional infringements of the kind presented by the issues herein, the Court in imposing equitable principles relies upon its inherent equitable powers as defined by the Supreme Court of the United States in *Swann v. Charlotte-Mechlenburg Board of Education,* 402 U.S. 1, 13–14, 91 S.Ct. 1267, 1274, 28 L.Ed.2d 554 (1971):

In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has

been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them. *Brown v. Board of Education*, 349 U.S. 294, 299–300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).

▮ Thus, once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. Judicial authority enters only when local authority defaults.

The Supreme Court in *Swann, supra,* amplified this pronouncement, 91 S.Ct. at page 1276:

> However, a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of individual and collective interests, the condition that offends the Constitution.

For the reasons hereinbefore stated defendants James R. Rhodes, Governor, State of Ohio, Timothy Moritz, Director of the Department of Mental Health and Mental Retardation, and Ralph J. Perk, Mayor, City of Cleveland, were ordered joined as parties to this action for purposes of formulating and affecting the remedies designed to correct existing and future constitutional infringements. It is not contended that the joined parties are charged under law with, or have participated in, the administration and operation of the Cuyahoga County Jail, which responsibility has been, by legislative enactment, delegated to the Cuyahoga County Court of Common Pleas, Commissioners and Sheriff. Nevertheless, the joined parties are indispensable to affecting the relief ordered herein and will be afforded full opportunity to present appropriate evidence to the Court at hearings to be conducted within the requirements of law.

The problems encountered by district courts and courts of appeal place upon these judicial bodies the duty to amplify guidelines, however incomplete and imperfect, for the assistance of local authorities and courts. The protracted failure of local authorities to meet constitutional obligations has aggravated the crisis at Cuyahoga County Jail beyond reason and the eradicating of Constitutional offenses complained of herein can no longer be denied.

It is therefore ORDERED that the defendants submit to the Court:

1. A comprehensive, detailed and written plan for the creation of a psychiatric ward by no later than June 30, 1975;

2. A comprehensive, detailed and written plan providing for psychiatric screening, of all inmates on a continuing basis including follow-up observation and treatment of such inmates fully implemented by not later than July 31, 1975;

3. A comprehensive, detailed and written plan for the training of jail security personnel in the detection, observation and handling of psychiatric cases to be implemented by not later than June 30, 1975, to be fully implemented by July 31, 1975.

Proceeding to a consideration of outstanding issues Numbered 3, 4, 5, and 6 hereinbefore defined, the Court for resolution thereof adopts and applies the guidelines enunciated by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Prologue to disposition is a restatement of a fundamental principal that it is universally accepted that the very nature of due process negates all concept of inflexible procedures universally applicable to every imaginable situation. Consideration of what procedures due process may require under any given set of circumstances must evolve from a determination of the precise nature of the government function involved as well as of the private interest affected by governmental action. *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Viewed in this light it is immediately apparent that a Court cannot automatically apply procedural rules designed for free citizens in an open society or for parolees or probationers under only limited restraints as in *Morrissey, supra,* to a juxtaposition situation presented by disciplinary proceeding in County Jail.

Impressing the logic of the pronouncements of *Wolff, supra,* upon disciplinary procedures of a local County Jail designed primarily as a temporary detention facility for comparatively short periods of confinement of prisoners awaiting trial or some other legal disposition pending discharge and/or transfer to a State or Federal penal compound, the Court is constrained to conclude that the general range of procedures suggested by *Morrissey, supra,* for parole violators and the more limited range of procedures suggested by *Wolff, supra,* for prisoners of State penal institutions faced with reduction or cancellation of "good time" is appreciably different from disciplinary procedures promulgated for prisoners temporarily confined for comparatively short periods of time in County Jails with limited facilities and personnel.

The full range of procedures afforded by *Morrissey, supra,* are justifiable when the proceeding is conducted in an open climate without jeopardy to other State interests, parole officers, the police, or witnesses at least no more so than in the case of ordinary criminal trials. Jail disciplinary proceedings, on the other hand, take place in a close controlled environment, peopled by those who have elected to violate the criminal law or at least have been accused of violating the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders but many are recidivists who have repeatedly employed illegal and often extremely violent means to attain their ends. Such individuals may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe existence during the period of their temporary confinement at such detention center. Although there are many varieties of such institutions with varying degrees of security it is a reality that in most, guards and inmates coexist in direct and intimate daily and hourly contact. Tension is unremitting. Frustration, resentment and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

It is against this background that disciplinary proceedings must be structured by jail authorities; it is against this background that the Court must exercise constitutional judgment realizing that it is confronted with the ever existing security problems of jail authorities in maintaining the integrity of the institution and the safety of inmates.

The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authorities and between inmates who are being disciplined and those who charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task in providing reasonable personal safety for guards and inmates may be at stake to say nothing of the disciplinary confrontations and the resulting escalation of personal antagonism.

Inevitably, there is a great range of personality and character among those who have transgressed the criminal law. Some are more amenable to suggestion and persuasion than others, some may be incorrigi-

ble and would disrupt and exploit the disciplinary process for their own ends. It would appear, therefore, that encasing inflexible constitutional restraints that are necessarily imposed on adversary proceedings typical of a criminal trial upon disciplinary proceedings at a County Jail would aggravate confrontations between staff and inmates in the highly charged atmosphere already prevailing in an overcrowded facility and make more difficult the daily routine and security impressed upon staff and inmates alike. It is within this context that the Court now examines in more detail the issues hereinbefore defined. *Wolff, supra.*

■ In considering the right of the accused inmate to confront and cross-examine his accusers at a disciplinary hearing, the Court again adopts the standard of *Wolff*:

> We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; . . . Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. . . . The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments. There is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.
>
> Confrontation and cross-examination present greater hazards to institutional interests. If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability. . . . We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination.

Accordingly, within the prevailing environment wherein prison and jail disruptions remain a serious concern to administrators, the Court cannot ignore the desire and effort of local jail authorities to avoid situations that may trigger deep emotions and undermine and defeat a disciplinary process as a rehabilitation vehicle. The American adversary trial presumes emotionally stable contestants capable of coping with the pressures and aftermath of the battle, however, such may not generally be the case of those confined to prisons or jails. At least, the Constitution, as interpreted by the Supreme Court in *Wolff, supra,* and adopted herein does not require the contrary assumption. Within the limits set forth in this opinion, the Court is content for now to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of jail officials administering the scope of such inquiries.

In considering the right of accused inmates to legal counsel or counsel substitute at a disciplinary hearing, the Court con-

cludes that inevitably the proceeding would immediately assume a more adversary cast, become protracted and less effective in result. Again, in *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Supreme Court summarized as follows:

> The introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding. If counsel is provided for the probationer or parolee, the State in turn will normally provide its own counsel; lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support of their clients' positions and to contest with vigor all adverse evidence and views. The role of the hearing body itself, aptly described in *Morrissey* as being "predictive and discretionary" as well as factfinding, may become more akin to that of a judge at a trial, and less attuned to the rehabilitative needs of the individual probationer or parolee. In the greater selfconsciousness of its quasi-judicial role, the hearing body may be less tolerant of marginal deviant behavior and feel more pressure to reincarcerate than to continue nonpunitive rehabilitation. Certainly, the decisionmaking process will be prolonged, and the financial cost to the State—for appointed counsel, counsel for the State, a longer record, and the possibility of judicial review—will not be insubstantial. 411 U.S. at 787–788, 93 S.Ct. at 1762.

■ At this stage of the development of these procedures, the Court is not prepared to hold that inmates have a right to either retained or appointed counsel or counsel substitute at disciplinary hearings except within the limited area defined by *Wolff, supra,* 94 S.Ct. at 2982:

> Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate sub-

stitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff. We need not pursue the matter further here, however, for there is no claim that the named respondent, McDonnel, is within the class of inmates entitled to advice or help from others in the course of a prison disciplinary hearing.

■ In considering the issue of an inmate's right to send and receive mail while confined to isolation, this Court's attention is directed to *McDonough v. Director of Patuxent,* 429 F.2d 1189 (4th Cir. 1970) wherein the Court stated on August 10, 1970, that although incarcerated in a penal institution, an individual does not automatically surrender all rights, and the law recognizes that:

> . . . "a right of access to the courts is one of the rights a prisoner clearly retains. It is a precious right, and its administratively unfettered exercise may be of incalculable importance in the protection of rights even more precious." *Coleman v. Peyton,* 362 F.2d 905, 907 (4 Cir.), cert. den., 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966). This right, we have recognized, carries with it the right to seek and obtain the assistance of competent counsel so that the assertion of legal claims may be fully effective. *Coleman v. Peyton,* 340 F.2d 603 (4 Cir. 1965); *McCloskey v. State of Maryland,* 337 F.2d 72 (4 Cir. 1964). In *Coleman* (362 F.2d 905), we held that undelayed, uncensored, unlimited use of the mails was necessary to secure the right. In *Coleman* (340 F.2d 603), and *McCloskey* we recognized that the right to counsel carried with it the right to use the mails to obtain and communicate with counsel.

■ Thus, it would appear that undelayed, uncensored, unlimited use of the mails at all times, including periods of confinement to isolation, as a means of access to the courts, the right to seek and obtain the assistance of competent legal counsel, and continuous correspondence therewith shall not be abrogated. It is equally true,

however, that jail officials delegated with the responsibility for the security of the jail and the safety of its population must have a wide discretion in promulgating rules to govern the jail population and in imposing disciplinary sanctions for violations thereof, however, an inmate, even when confined to isolation, should be permitted a reasonable and proper correspondence with members of his immediate family, a broader correspondence, on the other hand, is subject to substantial limitation or to absolute prohibition. Control of the mail to and from inmates is an essential adjunct of jail administration and the maintenance of order within the institution. *McDonough, supra.*

■ Jail authorities may also continue to exercise discretion in denying an inmate the right to receive publications having a deleterious affect upon institutional control and discipline because of apparent defiance and critical attitude expressed therein which would reach other inmates and thereby disrupt the security of the institution and the safety of its occupants. Notification to the inmate of rejection of any given publication and the return of such publication to the inmate's listed address is not, however, an undue burden to be assumed by the administrative offices of the detention center.

Visitation rights and implementation thereof, and persons to be included therein, inmate telephone calls and implementation thereof including number and timing thereof are simultaneously fundamental to institutional security and to inmate morale and when the two are in conflict, the need for security is paramount but the need must be supported by reason. Thus, the doctrine of least necessary restraint, as a matter of due process, requires that the regulations attaching thereto be curbed or restricted only to the extent required to assure institutional security and administrative manageability.

The security of County Jail impacted by an outmoded physical structure, overcrowding of inmates and limited staff severely limits the scope of this Court's Order to enlarge the privileges of visitation and telephone use.

Visitation at County Jail is presently in accordance with Rules And Regulations Governing Cuyahoga County Jail ¶ 8, Plaintiff's Exhibit 1:

8th. Each prisoner in the jail is permitted to receive visitors on any Saturday or Sunday between the hours of 1:00 P.M. and 5:00 P.M. Visitation is restricted to the following relatives: father, mother, wife, husband, brother, sister, son, daughter, grandchildren or grandparents. General visitation shall be screened visits and limited to 15 minutes unless varied by the Sheriff in unusual cases. In the event of a prisoner not having any of the aforementioned relatives, he may nominate in writing the name of a friend for visiting. Approval of visitors will be the responsibility of the Sheriff or a particular deputy designated by him. No minor may visit an inmate.

Apart from what appears to be an inconsistency in the above paragraph which is hereby corrected by striking therefrom the following language "No minor may visit an inmate.", the Court concludes that even under existing conditions visitation rights are overly restricted. Recognizing the increased burden and perhaps expense imposed upon the administrative authorities, the Court concludes that proper planning could insure each inmate at least three visitation periods each week.

The testimony of Edward Payne, Warden of the Cuyahoga County Jail, discloses an absence of definitive routine designed to facilitate telephone use by inmates. Accordingly, It Is ORDERED that the Sheriff shall, by not later than June 30, 1975, submit to the Court for approval a comprehensive plan calculated to accord inmates reasonable visitation and telephone use.

Considering plaintiffs' request to extend visitation rights to law students, investigators and other agents of attorneys of inmates with the two issues immediately hereinabove discussed, the Court is not presently disposed to disturb the exercise of discretion by jail authorities in permitting or denying such procedures.

The very limited relief afforded herein as to these three issues is not to be construed nor is it intended to reflect the Court's views as to the ultimate relief available under law as to these requests. Obviously, upon implementation of this Court's Order and resultant reduction in the jail population through the creation of a satellite facility and with the completion of the modern detention blocks presently under construction at the Justice Center the alleviation of presently existing security and safety problems, the responsibility of reconsidering, redefining and insuring these vitally important rights and privileges within the liberal pronouncements of existing law will hopefully be accepted, assumed and administered on a continuing basis by the Common Pleas Court of Cuyahoga County pursuant to its mandate from the Legislature expressed in Ohio Rev.Code § 341.06:

The court of common pleas shall prescribe rules for the regulation and government of the county jail upon the following subjects:

(A) The cleanliness of the prison and prisoners;

(B) The classification of prisoners as to sex, age, crime, idiocy, lunacy, and insanity;

(C) Food and its preparation;

(D) Bed and clothing;

(E) Heating, lighting, and ventilating the prison;

(F) The employment of medical or surgical aid, when necessary;

(G) The employment, temperance, and instruction of the prisoners;

(H) The supplying of each prisoner with a copy of the Bible;

(I) The intercourse between prisoners and their counsel, and other prisoners;

(J) The punishment of prisoners for violation of the rules of the prison;

(K) Other rules necessary to promote the welfare of the prisoners.

To summarize, It Is ORDERED that:

1. The total number of inmates to be incarcerated within the County Jail situated at 1560 East 21st Street, Cleveland, Ohio, at any given time subsequent to September 30, 1975, shall not exceed 375 individuals;

2. The defendants herein including the City of Cleveland shall present to the Court by not later than June 30, 1975, a joint comprehensive plan designed to reduce the population of said institution within a period hereinbefore designated, i. e. September 30, 1975;

3. The defendants herein including the City of Cleveland and the State of Ohio shall present to the Court a joint comprehensive detailed, written plan for creation of a psychiatric ward by no later than June 30, 1975, to be effective no later than July 31, 1975, providing for:

a. A comprehensive, detailed, written plan for psychiatric screening of all inmates on a continuing basis;

b. A comprehensive detailed, written plan for observation and treatment of psychiatric inmates;

c. A joint comprehensive, detailed and written plan for the training of jail security personnel in the detection, observation and handling of psychiatric cases;

4. The right of an accused inmate to confront and cross-examine his accuser at disciplinary hearings is committed to the sound discretion of jail officials administering such inquiries;

5. The right of accused inmates to legal counsel or counsel substitute at a disciplinary hearing are committed to the sound discretion of jail officials administering such inquiries within the pronouncements of the U. S. Supreme Court in *Gagnon, supra* and *Wolff, supra;*

6. Inmates, even while confined to isolation, shall not be denied undelayed, uncensored, unlimited use of the mails at all times as a means of access to the Courts, the right to seek and obtain the assistance of competent counsel and continuous correspondence therewith;

7. Inmates, even while confined to isolation, shall not be denied a reasonable and proper correspondence with members of the immediate family;

8. Broader correspondence is subject to substantial limitation or to absolute prohibition and publications deleterious to institutional control and discipline may within the discretion of jail authorities be prohibited subject to:

a. Written notification of the inmate of such rejection stating the reasons therefore to the return of such publication to the inmate's last listed address;

9. The County officials shall present for approval to the Court by not later than June 30, 1975, a written comprehensive and detailed interim program insuring each inmate at least three visitation periods each week and a plan designed to accord inmates reasonable use of telephonic communications;

10. County officials shall conduct for presentation to the Court by not later than June 30, 1975, an inventory of the legal library available to detainees, together with an acceptable procedure insuring access to such library by inmates;

11. County defendants shall present for the Court's approval a plan whereby the Chief Justice of the Common Pleas Court of Cuyahoga County shall be advised quarterly in written comprehensive form as to prevailing conditions within the eleven areas of its responsibility delineated in Ohio Revised Code § 341.06.

IT IS SO ORDERED.

## PARTIAL CONSENT JUDGMENT.

Without admitting their liability, and without admitting that they have engaged in any of the practices herein prohibited or admitting that they have not engaged in the practices hereby required, the defendants do consent to the Court entering the following Order. The partial settlement of this case as contained in this Order is not in any way a decision on the facts or legal merits of issues which might have been or were mentioned while this suit was pending but which are not specifically mentioned in this Order. The masculine pronouns used include the feminine reference when appropriate. Therefore, it is

ORDERED, ADJUDGED, AND DECREED that the Defendants, their agents, employees, assigns, successors in office, and all those in active concert and participation therewith are enjoined to comply with the standards for pretrial detainees for the Cuyahoga County Jail (hereinafter Jail) set forth below, within 90 days of the entry of this Order, and to comply with the provisions of Ohio Revised Code Chapter 341 on Jails which do not conflict with said standards:

## DISCIPLINE

A. *VIOLATIONS AND PENALTIES:*

1. Within twenty-four hours of his arrival in the jail, each inmate shall be given a written copy of what constitutes violations of the jail rules, and what the potential penalties for these rule violations are. A written summary of the rights of inmates at disciplinary hearings will also be provided at the same time to each inmate.

2. Loss of privileges shall be for a specified number of days. If the period of isolation for a particular rule violation is indeterminate, that isolation shall be reviewed each week by a deputy of the rank of at least shift lieutenant.

3. The following procedures shall be followed whenever a disciplinary hearing is held. The issue of which offenses against jail rules require a hearing and which, if any, do not is reserved for later determination.

B. *PROCEDURE IN THE CASE OF VIOLATIONS:*

1. Action prior to hearing:

(a) When a deputy suspects that an inmate has violated a jail rule, he can place that inmate in isolation. The deputy shall then promptly submit a report to his immediate supervisor, explaining the action taken, the reasons for the action, the alleged rule violation, the inmate's name and C.C. number, the time of confinement, and the name of the officer placing the inmate in isolation.

(b) A charged inmate shall be informed in writing of the rule broken and the facts on which the charge is based. This shall be at least 24 hours before the hearing. He shall also be advised orally of what his rights are in regards to the disciplinary hearing.

(c) The Warden, or his designee, shall make a determination, in the case of any rule violations listed as major in the schedule of jail rules, of whether or not the facts of the alleged violations shall be presented to the prosecutor. If the facts are presented to the prosecutor, the inmate shall not be disciplined or put into isolation. He can, however, be put in a higher security level. If the Warden, or his designee, decides not to present the facts to the prosecutor, a disciplinary hearing can be held, but the inmate shall be advised that he has the right to remain silent at the hearing.

2. Hearing procedure:

(a) A hearing shall be held within 36 hours of the time an inmate is placed into isolation, is locked in his cell, or has one of his privileges withdrawn. However, this time limitation will be suspended on weekends and holidays.

(b) There shall be a summary written record of the proceedings maintained by the Sheriff's Department.

(c) The hearing officer shall be either the Warden or a shift lieutenant, as long as he is not the charging officer, or a witness. If he is the charging officer or a witness, someone of at least equal rank shall preside.

(d) The inmate has the right to testify and shall be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to the institutional safety or orderly administration of the facility. When there is a limitation placed on the inmate's testimony, or on the witnesses he is allowed to call, the reasons shall be set forth in writing in the record.

(e) The hearing officer shall exercise control over the hearings, and the evidence presented shall be subjected to reasonable limits as to amount and relevance. He shall make his decision, which shall be in writing, and based on the evidence taken, state the reasons for the decision, and the punishment to be imposed. The charging party shall have the burden of proving each element of the charged offense.

(f) An inmate in isolation may be deprived of the following: Television, commissary (excluding personal hygiene articles), phone calls (excluding calls to attorney), visitation (excluding that of attorney, chaplain and social worker).

3. At all times the Sheriff shall have the authority to provide for the general safety and security of all inmates and other personnel by the exercise of proper discretion under his office. Pursuant to said authority, the Sheriff may temporarily suspend the above set forth disciplinary procedures. As soon as is practicable, the standard procedure shall be restored. The reason for each such suspension shall be journalized and open to inspection.

### FOOD SERVICE

1. In addition to the initial medical exam, all inmates who have applied for and then been selected for jobs in the kitchen and/or for serving food shall be given a thorough medical exam by the jail physician or supervising nurse prior to assuming the job

in the kitchen or serving food. The examination must be geared towards determining if the inmate has or is a carrier of any communicable disease, including skin disease. The results of the examination shall be recorded and the jail physician must approve the inmate for work in the kitchen or serving the food before the inmate can assume the job.

2. The Sheriff shall continue his practice of serving food to inmates in quantities sufficient to supply every inmate with an average daily intake complying with the caloric and nutritional standards recommended by the U. S. Bureau of Prisons, or by some comparable professional agency. The menus being used and standards being followed shall be made public.

3. At least twice during the year, the Sheriff or his agent shall request the Department of Nutrition of Cuyahoga Community College or a comparable agency to review the jail menus to determine if the meals meet the standards in paragraph 2.

## MEDICAL SERVICES

### A. *INITIAL EXAMINATIONS:*

1. The jail physician shall conduct an initial examination of each inmate within twenty-four hours of his being processed into the jail. In order to achieve this end, each day the security personnel must provide the jail physician with written notice of all inmates processed into the jail that day. Such information as may be medically useful will be included in the notice provided by the officer, and said written notices shall be kept as part of the jail records. If an emergency arises in the jail which makes it impossible to examine an inmate within 24 hours of his arrival, the jail physician shall record the nature of the emergency and why it is impossible to examine each inmate within the twenty-four hours of his arrival. In no circumstances shall the initial examination of an inmate be delayed more than forty-eight hours after he has been processed into the jail.

2. During the initial medical examination, a complete medical history, including allergies, of the inmate, shall be taken and a complete visual inspection of the inmate shall be made. The inmate's heart shall be checked and a chest x-ray taken. The inmate shall also be checked for venereal or other communicable diseases, epilepsy, diabetes, and narcotic or alcohol addiction and/or overdose. A record shall be kept of this examination, and this record shall include the date of examination.

### B. *COMMUNICATING THE NEED FOR MEDICAL ASSISTANCE:*

1. The jail physician shall institute a standardized procedure whereby all requests for medical attention shall be transferred promptly and directly to the jail physician, nurse, or paramedic. This shall include, but shall not be limited to, a procedure whereby at least once every day a paramedic, nurse, or physician shall make a thorough check in all parts of the jail to see if any inmate has a request for medical assistance. All requests for assistance shall be reviewed by the jail physician.

2. The jail physician and supervising nurse shall at all times have authority to have any inmate transferred to the dispensary promptly. Before an officer transfers an inmate to the dispensary without a request by the jail physician or supervising nurse, he should consult first with either the jail physician or nurse, except in an emergency situation.

3. When a request for medical assistance is made, a nurse, paramedic, or the jail physician must see the inmate requesting assistance. Any treatment given to an inmate by a nurse or paramedic shall be recorded, and

the record shall be reviewed by the physician.

4. An officer shall immediately notify the jail physician or nurse upon observing an inmate with a medical emergency, such as an inmate who is bleeding, vomiting, having convulsions, hallucinating, in a state of unconsciousness, or who has broken bones. The physician or nurse will either promptly come to the floor on which the inmate is located to examine that inmate, or shall order the inmate transferred immediately to the dispensary.

5. Officers shall be equipped to recognize and handle medical emergencies until the nurse arrives on the scene. Therefore, all officers shall have been given basic courses in first aid and the recognition of medical emergencies before starting working in the jail. The fact that they are given this training, however, shall not permit them to delay their call to the nurse or physician when they recognize an emergency.

6. The jail physician shall enter into negotiations with the Academy of Medicine's Committee on Correctional and Jail Medicine to establish a committee of doctors to receive, investigate and consider complaints, promptly and fully, regarding medical treatment at the jail. This committee's recommendations and determinations concerning medical care will be given consideration and will be made available to all interested parties. It shall not, however, be the function of the committee to determine questions of compliance with this order.

C. *PRESCRIBING AND DISPENSING MEDICINE:*

1. Medicine shall only be dispensed by a paramedic, nurse, physician, or in emergencies by an officer specially trained by the medical staff in the jail.

2. Each inmate must receive all the medicine prescribed for him in the quantities in which and at the time for which it has been prescribed. If the inmate is not in his cell or block, the individual dispensing the medicine must determine where the inmate is, and have the medicine promptly taken to him.

3. Each day the medical staff shall be given a list of which inmates are going to court the following day, so those inmates can receive any medicine the physician feels should be given said inmates that day, provided in his judgment such medication does not interfere with his competency at trial.

4. At least one physician, nurse, or paramedic shall be on duty 24 hours a day, seven days a week. A paramedic is anyone who has successfully completed a physician's assistants course of two years duration with an associate degree; has qualified as a medical technician or ward attendant in the military service through completion of medical courses followed by at least one year of actual service in the field; or who may otherwise be considered by the jail physician to be qualified by the many years of practical experience in medical work as a hospital orderly, nurse's aid, or medical technician.

D. *CONTROL OVER THE HOUSING OF INMATES WITHIN THE JAIL:*

1. The jail physician shall make the exclusive determination of which inmates are admitted to and discharged from the hospital range. His determinations shall be based on the medical needs of the inmates.

2. The jail shall have three cells set aside for inmates with contagious diseases. Inmates may be placed in these cells for non-medical reasons; but if an inmate with a contagious disease needs to be put in medical isolation, then the other inmates must be removed. The jail physician shall make the exclusive determination of

which inmates are to be medically isolated and for how long. Once an inmate is removed from medical isolation, the cell shall be sanitized promptly. No other inmate shall be placed in the cell until it has been sanitized.

3. Any time the jail physician wishes to see an inmate in the dispensary, an officer shall bring the inmate to the dispensary promptly. The jail physician can also visit any inmate in his cell or block at any time.

E. *OUTSIDE PHYSICIANS:*

1. Nothing in this Partial Consent Judgment shall change, affect or interfere in any way with the Order issued in *Cudnik v. Kreiger,* Case No. C 74–275 [D.C. 392 F.Supp. 305].

F. *DENTAL CARE:*

All inmates shall be treated for dental emergencies.

G. *TRANSPORTATION FOR MEDICAL APPOINTMENTS:*

An inmate shall be transported to any medical appointment scheduled for him by the jail physician or scheduled for him by another physician and approved by the jail physician. The defendant shall provide, as needed, two vehicles to transport inmates for medical or probate purposes. Further, to that end the defendants shall provide a holding area at Cleveland Metropolitan General Hospital to allow all inmates with appointments to be transported in groups and detained at the hospital while awaiting appointments. The jail physician shall have the ultimate authority to determine and regulate medical appointments under this provision.

## COMMUNICATIONS

A. *MAIL:*

1. No letters sent by inmates will be opened or read. There can be no limits placed on the number of letters an inmate can send if he is able to pay for the letters himself.

2. Upon request, indigent inmates will be provided with stamps, envelopes, paper and writing material to mail up to five (5) letters a week. If the inmate purchases these items, the cost will be subtracted from the inmate's commissary account balance, and he will be so advised of this fact.

3. Incoming letters can be checked for contraband, but the contents of these letters cannot be read by anyone other than the inmate addressee. No restrictions shall be placed on the number of letters an inmate can receive.

4. An inmate is allowed to receive any magazine, newspaper or other periodical, unless it is determined to be pornographic as defined by state law, or unless it presents a clear and present danger to the security of the jail.

B. *TELEPHONE:*

Each inmate shall be allowed to place one collect long distance call upon entry to the jail. Upon request, an inmate may make a long distance collect call through the pay telephone; this to be discretionary with the sheriff's department.

C. *VISITS:*

1. The conversations taking place during a visit shall not be overheard by officers or social workers, but the visits themselves may be observed.

2. Any inmate shall be allowed to visit with any attorney or attorneys. There shall be no restrictions placed on the number of attorney visits allowed to an inmate, and attorneys shall be allowed to visit inmates at all reasonable times during the day and evening, seven days a week.

3. Attorneys shall be allowed to interview inmates in the present interview facilities on the fourth floor. However, space shall be provided where, if he wishes, an attorney can talk to an inmate in privacy.

4. Attorneys shall be allowed to bring recording devices into the jail to rec-

ord interviews with inmates. Officers shall have the right to inspect these recording devices as they are brought into and taken out of the jail. However, any recordings made cannot be listened to or confiscated.

D. *HEATING:*

Broken windows shall be repaired within 24 hours, and the temperature of the jail shall be maintained at 68 degrees F. in the Winter.

E. *PROGRAM:*

1. Checkers, cards, and chess sets shall be allowed on the ranges and in the cells.

2. The Sheriff shall provide space within the jail for remedial reading, vocational training and other educational courses, to be taught to inmates who volunteer for the courses.

3. The county shall provide social workers with counseling duties for the inmates, and there will be offices in which they can consult with the inmates in private. The social workers shall also be allowed to visit the ranges freely and talk to the inmates.

4. Recognized clergy of all religions, including the Muslim faith, priests, rabbis and other clergy shall be permitted to visit inmates at reasonable times for reasonable intervals.

5. Each inmate shall be given the opportunity to freely worship according to the precepts of his religion, within reason and according to law. Religious services shall be provided for the inmates each week, and inmates will be given an equal opportunity to participate in the worship of his faith.

6. The commissary in the jail shall provide newspapers, tobacco and various items for personal hygiene. The price of these articles shall not be higher than the retail price of such an item. Indigent inmates shall be furnished certain items at no cost.

7. A list of the prices of commissary items shall be made available to the inmates, and it shall also be made available to the public-at-large. Records of all inmate commissary transactions shall be maintained.

8. Failure to include any program on this list shall not be interpreted as authority to exclude any other program alternatives.